**ALASKA STEAMSHIP COMPANY,**
**a corporation, Petitioner,**

**v.**

**FEDERAL MARITIME COMMISSION**
**and United States of America,**
**Respondents.**

**No. 22439.**

United States Court of Appeals
Ninth Circuit.

Aug. 27, 1968.

Rehearing Denied Oct. 1, 1968.

Stanley B. Long (argued), Arthur Grunke (argued) Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., for appellant.

Robert N. Katz (argued), Gen. Counsel, Thomas A. Lisi, Secretary, Norman D. Kline, Hearing Counsel, Warren Price, Jr., for intervenor, Robert W. Ginnane, amicus curiae, Washington, D. C., for appellee.

Before HAMLEY, MERRILL and CARTER, Circuit Judges.

MERRILL, Circuit Judge:

The Federal Maritime Commission has regulatory jurisdiction over interstate water carriage to and from the State of Alaska. Where such carriage is combined with carriage by motor transport, in through-route and joint-rate arrangements, jurisdiction over rates lies with the Interstate Commerce Commission.[1]

---

1. In 1940 Congress placed interstate water carriers under the jurisdiction of the ICC.

Part III of the Interstate Commerce Act, 49 U.S.C. §§ 901–923. It excepted water

Alaska Steamship Company is a common carrier by water, operating between Seattle, Washington, and various points in the State of Alaska and, until the events leading to these proceedings, has operated entirely under FMC regulation. In 1967 it entered into through-route and joint-rate arrangements with certain motor carriers and notified FMC of the cancellation of certain tariffs theretofore on file with FMC, to be superseded by joint-rate tariffs that had been filed with ICC. FMC suspended cancellation of the rates, conducted an investigation and subsequently ordered Alaska Steam to rescind its cancellation and continue to file tariffs with the FMC. *Alaska Steamship Co.—Cancellation of FMC Port-to-Port Rates—West Coast/Alaska Trade,* No. 67–52 (February 14, 1968). Its position in substance is that the through-route joint-rate arrangements are sham, serving to mask an effort at agency-forum shopping. Alaska Steam, by these proceedings, seeks review of that order under 28 U.S.C. § 2342. The ICC, in support of its own jurisdiction, appears as amicus curiae. Faced with what is, in essence, an interagency dispute and concerned over the possibility of forum shopping, the United States (nominal respondent in these proceedings under 28 U.S.C. § 2344) has aligned itself with FMC.

The through routes brought into question by the FMC order are of two types: (1) those involving connections with local motor carriers in Seattle; (2) those involving connection with motor carriers in Alaska who utilize the Alaska State Ferry.

### 1. Seattle Connections

Alaska Steam has entered into arrangements with a motor carrier in Seattle whereby the motor carrier picks up cargo at the shipper's premises and delivers it to Alaska Steam's pier for loading and shipment to various Alaska ports. The motor carrier issues through bills of lading in its name covering the entire journey up to final delivery in Alaska and charges for the full journey. Similar arrangements are contemplated for shipments from various points in Alaska to final destination in Seattle.

The FMC characterizes this operation as "pickup and delivery," and says that the charges for this service should be included in the water carrier's tariff as "terminal charges" under § 2 of the Intercoastal Shipping Act, 46 U.S.C. § 844 (1964). It contrasts such arrangements with those between "line haul" carriers. It argues that it was the latter type of connection with which Congress was concerned in providing for through routes and joint rates between water and motor carriers. It argues that Congress, in amending the Interstate Commerce Act in this respect, had no intention of making changes in existing practices; rather it was attempting to fill a void—to permit arrangements that could not, without such legislation, be enjoyed. FMC asserts that local pickup and delivery ar-

carriers operating between the states and territories, leaving such operation under the jurisdiction of the FMC to be regulated under the Shipping Act of 1916, 46 U.S.C. §§ 801–842, and the Intercoastal Shipping Act of 1933, 46 U.S.C. §§ 843–848. Upon Alaska's admission to statehood, jurisdiction over water transportation to and from Alaska would automatically have passed from FMC to ICC. However, pending further study of the matter, jurisdiction over interstate water carriage to and from Alaska was retained in the FMC by § 27(b) of the Alaska Statehood Act, Public Law No. 85–508, 72 Stat. 351 (1958).

Common carriers subject to the jurisdiction of different agencies cannot, under

agency interpretation of the regulatory statutes, join with each other in establishing through routes and joint rates in the absence of specific statutory authority. Shippers in the Alaska trade were thus denied the benefits of such arrangements. To remedy this situation Congress enacted Public Law No. 87–595, 76 Stat. 397 (1962). This statute amended §§ 216(c) and 305(b) of the Interstate Commerce Act, 49 U.S.C. §§ 316(c) and 905(b), to authorize the establishment of through routes with joint rates between water carriers under FMC jurisdiction and motor carriers under ICC jurisdiction. Jurisdiction over such through routes and joint rates was given to the ICC.

rangements were available under FMC regulations without the need for creating a "through route" with a "joint rate." As precedent it points to its decision in Matson Navigation Co., 7 F.M.C. 480 (1963). There Matson had engaged local carriers as Matson's agents to perform pickup and delivery service in port areas. Matson paid the carriers the ICC tariff rates and included a charge for this service in its own tariffs. In its decision in that case FMC concluded that as long as such trucking service was in the nature of "pickup and delivery" as distinguished from "line haul," it did not constitute a through route; that the charge for such service was a "terminal charge" and that the water carrier's rates remained subject to FMC regulation.

FMC contends that, consistently with its position in *Matson*, we should here construe the term "through route" (as used by Congress respecting motor and water connections) as not encompassing connections with motor services that can qualify as pickup and delivery, since such connections remain available under FMC regulations.

The difficulty with this contention is that Congress did not apportion jurisdiction between the agencies on this basis.[2] The jurisdictional line was not drawn between line haul and pickup,[3] but at through routes which, historically, cover pickup and short-haul connections as well as connections between line-haul carriers.[4]

■ The existence of a through route depends not on the length of the respective hauls of the participating carriers but on the nature of the arrangements between them and their commitments to their shippers. In Thompson v. United States, 343 U.S. 549, 557, 72 S.Ct. 978, 96 L.Ed. 1134 (1952), the Court approved the following definition proposed by the ICC:

" 'A through route is a continuous line of [carriage] formed by an arrangement, express or implied, between connecting carriers. * * * Existence of a through route is to be determined by the incidents and circumstances of the shipment, such as the billing, the transfer from one carrier

2. The legislative history of the provisions in question, on which all parties to this dispute rely, is inconclusive. See, e. g., Hearing on H.R. 7297 and H.R. 7343 Before a Subcomm. of the House Comm. on Interstate and Foreign Commerce, 87th Cong., 2d Sess. (1962); H.R.Rep. No. 1769, 87th Cong., 2d Sess. (1962); S.Rep. No. 1799, 87th Cong., 2d Sess. (1962), U.S.Code Cong. & Admin.News 1962, p. 2160. In the absence of a definitive explanation of congressional intent in dealing with this problem, this court will not assume that Congress intended to use the terms "through routes" and "joint rates" other than in accord with their settled meaning of more than 50 years duration. See note 4, infra.

3. The uncertainty of such a line of distinction raises serious doubts as to the desirability of such a construction. In *Matson*, the FMC conceded that what "terminal charges" includes could only be determined on a case-by-case basis with consideration given to many factors.

4. In the Tapline Cases, 234 U.S. 1, 34 S. Ct. 741, 58 L.Ed. 1185 (1914), the ICC was not allowed to prohibit the use of through routes with joint rates by short

feeder lines and trunk lines where the length of a tapline haul varied from 40 miles to as little as 25 feet.

Manufacturer's Ry. v. United States, 246 U.S. 457, 38 S.Ct. 383, 62 L.Ed. 831 (1918), recognized as a through route requiring division of joint rates a connection between a trunk line and a feeder of two-and-one-quarter miles serving an industrial park.

ICC v. Hoboken Manufacturer's R.R., 320 U.S. 368, 64 S.Ct. 159, 88 L.Ed. 107 (1943), involved a connection between trunk carriers and a terminal switching line running about one-and-one-half miles between the dock and the railroad terminal. The dispute was over the division of joint rates. No doubt was expressed as to the propriety of a through route with joint rates.

In United States v. Capitol Transit Co., 325 U.S. 357, 65 S.Ct. 1176, 89 L.Ed. 1663 (1945), the Court upheld a through-route and joint-rate connection ordered by the ICC between local Virginia buslines and the streetcars of Washington, D. C. The ruling was adhered to in United States v. Capitol Transit Co., 338 U.S. 286, 70 S.Ct. 115, 94 L.Ed. 93 (1949).

to another, the collection and division of transportation charges, or the use of a proportional rate to or from junction points or basing points. These incidents named are not to be regarded as exclusive of others which may tend to establish a carrier's course of business with respect to through shipments.' "

■ Thus ICC does not dispute FMC's decision in *Matson*. An arrangement between carriers whereby one employs the other as agent for terminal delivery service, paying that carrier the ICC tariff rate, simply does not entail a joint rate. It does not entail obligations to the shipper such as are found in through routes. It does not present the regulatory problems presented by through-route and joint-rate arrangements.

■ When arrangements are entered into that do in fact constitute through-route and joint-rate arrangements, Congress has left their regulation with the ICC.

### 2. *Alaska State Ferry*

Alaska Steam does not call directly at all ports. It serves some indirectly by use of the Alaska Ferry. Cargo destined for Valdez, Alaska, is received at Seattle by Alaska Steam in vans which are carried to Cordova, Alaska. There the vans are delivered to a motor carrier which places them on trailers and drives them onto the Alaska State Ferry. The ferry carries the trailers to Valdez where they are again picked up by the motor carrier for final delivery. The motor tractor does not remain on the ferry, but is disengaged and driven off at Cordova with the process reversed at Valdez.

Alaska Ferry carries passengers and vehicles only. It will not accept cargo of any kind as such. When a truck is accepted for passage the ferry's bill of lading is to the trucker and its charges are based on the space occupied by the truck. It will accept no trailer unless the owner can both load and unload it. It will not participate in any through-route or joint-rate arrangement. It accepts no responsibility to any shipper and has no knowledge of the contents of any trailer.

Thus this is typical "fishyback" operation (the water equivalent of "piggyback" service), recognized to be "substituted service" where resorted to by a motor carrier as a substitute for the motor carriage for which it is certificated. See American Trucking Ass'n v. Atchison, T. & S.F. Ry., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). It does not appear, however, that the motor carrier in this case has ever been certified to truck by public highway from Cordova to Valdez, for there is no highway between these points. Thus we do not have a case of substituted service. The question is whether transportation on the ferry is itself motor transport and as such can form a part of a motor-water through route.[5]

FMC contends that it is not; that transfer to the ferry is substitution of one seagoing vessel for another and a combination of water movements; that it does not constitute a water-motor through route over which ICC has jurisdiction.

■ This court has recognized that a ferry is a continuous part of a road or highway and that transportation of a motor vehicle over a ferry is transportation by motor carrier. United Truck Lines v. United States, 216 F.2d 396 (9th Cir. 1954). The question here presented is whether the Alaska State Ferry is truly a ferry in the relevant sense. Upon this question this court also has spoken.

■ In Canadian Pacific Ry. v. United States, 73 F.2d 831 (9th Cir. 1934), and Puget Sound Navigation Co. v. United States, 107 F.2d 73 (9th Cir. 1939), certain factors were noted as significant: (1) length of the run; (2) type of ship (whether open-end or closed ocean go-

---

5. The fact that terminal deliveries made by motor carrier as in the Seattle situation result in through routes with joint rates does not moot this issue since, in some in-

stances, cargo is delivered by the shipper at the dock and picked up there by the consignee.

**628**

ing); (3) whether it was operated under state franchise or federal certificate of convenience; (4) whether it was equipped to carry cargo; (5) the extent to which service to passengers is emphasized; (6) the extent to which its use is necessitated by lack of land transportation.

Both sides take comfort from these criteria. The question is as to the weight to be given the respective factors. FMC places emphasis on distance, on the ocean-going type of vessel utilized by Alaska Steam and on the nature of its facilities for passengers, including berths, restaurants and cocktail bars.

ICC, on the other hand, has already ruled that transportation by truck via Alaska Ferry is motor transportation. Lindstrom Extension-Southeast Alaska, 98 M.C.C. 647 (1965); Blackball Freight Service v. Homefast Freight, Inc., 76 M.C.C. 5 (1958). The Commission there noted the absence of roads in Alaska, the near-impossibility of their creation, the refusal of the ferry to take cargo, that the rates are fixed in relation to space regardless of trailer content. It decided that, save for the distance involved, Alaska Ferry was exactly like the usual ferry and constituted a part of the highway system.

■ Upon this issue we find ourselves in agreement with ICC. These ferries do replace roads in Alaska rather than complement them. In the relationships into which they are willing to enter with truckers, they behave like ferries. FMC has itself recognized that the Alaska Ferry is not a common carrier of freight,[6] and does not regulate it as such. Only the extraordinary facts of Alaskan distances and geography require the ferries to depart from the typical in their operation.

We conclude that transportation of the trailers on Alaska Ferry does constitute motor transportation; that the combina-

tion of such transportation with that of Alaska Steam is an acceptable basis for a through route.

Reversed and remanded with instructions that the order of February 14, 1968, be vacated.

---

6. In 1963 FMC advised Senator Bartlett of Alaska that transportation of trailers by Alaska Ferry was transportation by motor carrier rather than by water carrier. On January 26, 1967, the FMC advised Alaska Steam to the same effect.