**SEA–LAND SERVICE, INC., Petitioner,**

v.

**FEDERAL MARITIME COMMISSION**

and

**United States of America,
Respondents.**

**No. 21529.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 20, 1968.

Decided Oct. 21, 1968.

Mr. Warren Price, Jr., Washington, D. C., for petitioner.

Mr. Robert N. Katz, Solicitor, Federal Maritime Commission, with whom Messrs. James L. Pimper, General Counsel, and Joseph F. Kelly, Jr., Atty., Federal Maritime Commission, were on the brief for respondent, Federal Maritime Commission.

Mr. Seymour H. Dussman, Atty., Department of Justice, of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of court, with whom Asst. Atty. Gen. Donald F. Turner and Mr. Irwin A. Seibel, Atty., Department of Justice, were on the brief, for respondent, United States of America. Mr. Howard E. Shapiro, Washington, D. C., also entered an appearance for respondent, United States of America.

Mr. Fritz R. Kahn, Deputy General Counsel, Interstate Commerce Commission, with whom Mr. Raymond M. Zimmet, Atty., Interstate Commerce Commission, was on the brief, for Interstate Commerce Commission, as amicus curiae.

Before BASTIAN, Senior Circuit Judge, and TAMM and ROBINSON, Circuit Judges.

BASTIAN, Senior Circuit Judge:

This action is a petition for review of an order of respondent, Federal Maritime Commission (hereinafter referred to as FMC). Petitioner, Sea-Land Service, Inc., (hereinafter cited as Sea-Land) is a large common carrier by water, with extensive operations in the transportation of containerized cargo. Since 1964, petitioner has operated between Seattle, Washington, and Anchorage, Alaska, a port-to-port service, including local motor pick-up and delivery. Sea-Land held itself out to the shipper or to the consignee in the Seattle and Anchorage port areas as the carrier solely responsible for the door-to-door transportation of the goods. This was done within the regulatory ambit of the FMC; the tariffs covering this service were filed with and approved by respondent. On June 26, 1967, Sea-Land filed notice to cancel this tariff, asserting that, with respect to its Seattle-Anchorage route, it would change from single carrier services and rates to joint through water and motor services and rates and would now redesignate its activities as those of a participant in a joint effort with a motor common carrier. Tariff schedules for this endeavor were accepted by the Interstate Commerce Commission (hereinafter referred to as ICC).

Sea-Land's notice to FMC of cancellation of tariffs was followed by respondent's order of suspension and investigation.[1] There followed a hearing which resulted, on October 23, 1967, in the issuance by FMC of a report and order[2] declaring that Sea-Land's activities in question are subject to FMC jurisdiction rather than to that of ICC. Sea-Land's petition for reconsideration of the order was denied by respondent. This proceeding ensued.

We have before us, in effect, competing claims of regulatory jurisdiction by two federal agencies. We must therefore review the legislative development of the particular activity sought to be regulated. Under the terms of the Shipping Act of 1916[3] and of the Inter-

---

1. Docket No. 67–43 Sea-Land Service, Inc.—Cancellation of FMC Port-to-Port Rates—West Coast/Alaska Trade.

2. *Ibid.*

3. 46 U.S.C. § 817 (1916).

coastal Shipping Act of 1933[4] jurisdiction over water common carriers engaged in interstate commerce in the Alaska trade was reposed in the FMC. This jurisdiction was buttressed by the Alaska Statehood Act[5] of 1958, Section 27(b) of which provides:

> Nothing contained in this or any other act shall be construed as depriving the Federal Maritime Board of the exclusive jurisdiction heretofore conferred on it over common carriers engaged in transportation by water between any port in the State of Alaska and other ports in the United States, its territories or possessions, or as conferring upon the Interstate Commerce Commission jurisdiction over transportation between any such ports.

Congress undoubtedly deemed this language necessary because the Transportation Act of 1940 [6] had transferred to the ICC jurisdiction over water transportation between the then existing forty-eight states. To the extent that the Shipping Acts of 1916 and 1933 were inconsistent, they were repealed. Further, it should be noted that motor common carriers picking up or delivering goods, preceding or following shipment by water between the mainland and Alaska, are subject to the regulatory requirements of the ICC under the Motor Carrier Act of 1935.[7]

The distillation of the spirit of all of this legislation reduces itself to the following:

> The FMC has jurisdiction over all-water transportation between Alaska and the mainland; the ICC must certificate motor common carriers connected with such transportation. However, neither Agency would accept tariff schedules establishing through routes and joint rates involving a combined transportation service between both motor and wa-

ter common carriers. It was this problem to which Congress addressed itself in 1962 when it passed Public Law 87–595[8] which amended Section 216(c) and 305(b) of the Interstate Commerce Act.[9] Indeed, it is the language and intent of this so-called Rivers Bill upon which our case turns. The pertinent wording provides:

> As used in this sub-section, the term 'common carriers by water' includes water common carriers subject to the Shipping Act, 1916, as .amended, or the Intercoastal Shipping Act of 1933, as amended (including persons who hold themselves out to transport goods by water, but who do not own or operate vessels) engaged in the transportation of property in interstate or foreign commerce between Alaska or Hawaii on the one hand, and, on the other, the other States of the Union, and through routes and joint rates so established and all classifications, regulations, and practices in connection therewith shall be subject to the provisions of this part.

Thus did Congress declare that, as to through routes and joint rates, jurisdictional authority shall vest in the ICC.

Respondent does not contest ICC's exclusive jurisdiction "where a motor carrier joins with a water carrier in establishing a combined motor-water service to Alaska via Seattle from an interior point in one of the contiguous forty-eight states." [10] However, respondent contends that this is the limit of Public Law 87–595, and that it does not extend to combined motor-water services where the motor portion is confined to pick-up and delivery in the port areas. We do not agree.

The first and most significant barrier to the FMC's position is the actual language of Public Law 87–595. Nowhere in the statute do we read, as respondent

---

4.  46 U.S.C. § 843 *et seq.* (1933).

5.  48 U.S.C. § 1 *et seq.* (1958).

6.  49 U.S.C. § 901 *et seq.* (1940).

7.  49 U.S.C. § 301 *et seq.* (1935).

8.  49 U.S.C. § 316 (1962).

9.  49 U.S.C. §§ 316(c) and 905(b) (1940).

10.  Brief for Respondent, pg. 7.

would have us do, a mileage limitation upon the authority of the ICC to regulate through routes and joint rates. The language of the statute makes no distinction between motor carrier participation of line-haul dimensions and motor carrier participation of merely pick-up and delivery in the port areas; no distinction between a thousand miles and a few blocks, as long as both motor and water carriers are performing a joint through service.

Perhaps the crux of respondent's position is that Sea-Land's terminal area motor pick-up and delivery activity is merely incidental to the line-haul water transportation, and thus, does not constitute a valid through route service. However, an analysis of the component parts of a through route service indicates that the extent of the motor participation is not the determining factor. What is required is that both motor and water carriers hold themselves out to the public as participants in a joint transportation endeavor and file appropriate tariff schedules reflecting these joint rates and through services.

In Thompson v. United States, 343 U. S. 549, 557, 72 S.Ct. 978, 983, 96 L.Ed. 1134 (1952), the Supreme Court states, "The test of the existence of a 'through route' is whether the participating carriers hold themselves out as offering through transportation service". This exact language was approved by the Court in Denver & Rio Grande Western Railroad Co. v. Union Pacific Railroad Co., 351 U.S. 321, 327, 76 S.Ct. 982, 100

L.Ed. 1220 (1956), and, more recently, in Western Pacific Railroad Co. v. United States, 382 U.S. 237, 243, 86 S.Ct. 338, 15 L.Ed.2d 294 (1965).

Another counterweight to respondent's position is that small terminal railroads performing only pick-up and delivery service for line-haul railroads have long had the right to join in the publication of through route, joint rate tariffs.[11] Of even greater significance is the fact that through routes have historically been validated in situations where one of the participating transporter's activities have been extremely minimal.[12]

The FMC states that it has traditionally regulated water carrier service which has included incidental pick-up and delivery by motor carrier in the port area.[13] Respondent contends that the legislative history of Public Law 87–595 evidences no intent upon the part of Congress to alter this FMC jurisdiction.[14] We are in agreement; we perceive no diminution of FMC jurisdiction as the result of our decision today. What is meant by the FMC when it refers to its traditional jurisdiction is regulation of water carrier tariffs which include motor pick-up and delivery service, so-called single-factor or all-water rates. Our decision here is confined to joint through services; it in no way affects all-water tariffs, the regulation of which remains within the authority of the FMC.

Respondent argues that there has been no change in Sea-Land's physical activities; that petitioner is merely

11. Powell v. United States, 300 U.S. 276, 286, 57 S.Ct. 470, 81 L.Ed. 643 (1937).

12. Tapline cases, 234 U.S. 1 (1914); Manufacturer's R. Co. v. United States, 246 U.S. 457, 38 S.Ct. 383, 62 L.Ed. 831 (1918); ICC v. Hoboken Manufacturer's R. R., 320 U.S. 368, 64 S.Ct. 159, 88 L.Ed. 107 (1943); United States v. Capital Transit, 325 U.S. 357, 65 S.Ct. 1176, 89 L.Ed. 1663 (1945).

13. North Carolina Line—Rates to and from Charleston, S. C., 2 U.S.M.C. 83 (1939). Increased Rates, Kuskokwin River, Alaska, 4 F.M.B. 124 (1952).

14. "This bill does not detract from the authority presently exercised by the Federal Maritime Commission over the Alaska waterborne carriers. It merely enables all surface carriers of origin in the 48 states to enter into through routes and joint rate arrangements I have mentioned and only to the extent that through routes and joint rates are involved would the ICC attain any jurisdiction over the vessels plying in the Alaskan trade." Congressman Rivers, 108 Cong.Rec. 11420 (1962).

using different nomenclature for the same conduct. This argument is wide of the mark, for it fails to distinguish the legal significance attaching, on the one hand, where Sea-Land assumes exclusive responsibility for the successful performance of door-to-door transportation, and on the other hand, where Sea-Land is a participant with a motor carrier in a joint undertaking. In the latter instance, there is a contract of carriage between both carriers and the shipper (or consignee), and both carriers are jointly and severally liable.

■■ Respondent states that Congress, in deciding where to place regulatory authority over through routes and joint rates, confined itself to the situation where two line-haul carriers participate in a through route and joint rate service; in short, that Congress did not intend Public Law 87–595 to cover Sea-Land's type of activity. Our answer is that petitioner's services fall within the plain language of the statute. Ordinarily, where the language of a statute is clear and unambiguous on its face, the thrust of that language should not be controverted by seeking to show an inconsistent legislative intent.[15] However, we do not rely on this alone in deciding whether or not Congress intended to include Sea-Land's type of activity within the language of Public Law 87–595. A careful reading of the legislative history of that Act reveals such history to be inconclusive on this point; we, therefore, must assume that Congress intended to use the terms "through routes" and "joint rates" as they have historically been understood for the past half century.[16]

■ We come to the final cannon in respondent's arsenal, that since the motor portion of Sea-Land's services is minimal, Congress intends it to be regulated as part of the dominant water haul. We believe that a careful reading of Section 202(c) of the Interstate Commerce Act[17] shows a different intention on the part of Congress. That section of the Act expressly exempts from ICC regulation motor carriers performing pick-up and delivery service in the terminal areas of line-haul railroad, airline and truck carriers subject to ICC or Civil Aeronautics Board (CAB) regulation. As long as the ICC or the CAB oversees the dominant transportation service, the pick-up and the delivery motor services in the terminal areas are exempt. However, no such exemption exists where the dominant transportation service is supplied by a water carrier subject to the Shipping Act of 1916.[18] This means that Sea-Land in its port areas cannot participate with or employ a motor carrier for pick-up and delivery unless that motor carrier is authorized by and has its tariffs filed with the ICC. This does not evidence to us an intent on the part of Congress, having now given exclusive jurisdiction over through route service to the ICC, to withdraw that jurisdiction because the water haul is dominant.

■ We conclude that even though the motor portion of Sea-Land's activities are confined to pick-up and delivery service within the port areas in question, Congress did not intend the motor carrier to be regulated as part of the dominant water transportation. Thus, it follows that where Sea-Land and a motor carrier are participants in a through route endeavor, regardless of the extent of the motor carrier's service, appropriate jurisdiction rests in the ICC. This same conclusion has been reached recently by the Ninth Circuit in

15. See United States v. Oregon, 366 U.S. 643, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961).

16. See note 12, supra.

17. 49 U.S.C. § 302 (1940).

18. Congress has considered the matter and has decided not to extend the 202 (c) exemption. House Comm. on Interstate and Foreign Commerce, Amending Section 202(c) of the Interstate Commerce Act, H.R.Rep. No. 116, 87th Cong., 1st Session (1961); Hearing on S. 1978 (Amendment to Section 202, Interstate Commerce Act-Terminal Exemption). Before Senate Comm. on Commerce, 87th Cong., 1st Session (1961).

a case presenting precisely the same facts and issues as this one.[19]

Reversed and remanded, with instructions that the Order of October 23, 1967, be vacated.

19. Alaska Steamship Co. v. FMC, 399 F.2d 623, 9th Cir. (1968).