**IML SEA TRANSIT, LTD., Plaintiff,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. No. C–70 2667.**

United States District Court, N. D. California.

April 21, 1972.

Edward J. Hegarty, Loughran, Berol & Hegarty, San Francisco, Cal., for plaintiff IML Sea Transit, Ltd.

James L. Browning, Jr., U. S. Atty., Ralph F. Bagley, Jr., Asst. U. S. Atty., San Francisco, Cal., for defendant United States.

James L. Pimper, Gen. Counsel, Federal Maritime Comm., San Francisco, Cal., Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Comm., Washington, D. C., for intervenor Federal Maritime Comm.

Robert S. Griswold, Jr., Regional Counsel, I.C.C., Bureau of Enforcement, San Francisco, Cal., Fritz Kahn, Gen. Counsel, Raymond M. Zimmet, Manny H. Smith, Attys., I.C.C., Washington, D. C., for defendant Interstate Commerce Comm.

Daniel W. Baker, Handler, Baker & Greene, San Francisco, Cal., for intervening defendants Hawaiian Express Service, Inc., D. C. Andrews International, Inc., Aloha Consolidators and Freight Forwarders, Inc., and Star Forwarders, Inc.

## OPINION

Before HAMLIN, Circuit Judge, and EAST and ZIRPOLI, District Judges.

PER CURIAM.

Pursuant to an order of investigation dated January 17, 1969, the Interstate Commerce Commission (hereinafter "ICC") commenced a proceeding against IML SeaTransit, Ltd. (hereinafter "SeaTransit") to determine whether SeaTransit was operating as a freight forwarder in interstate commerce without a permit from the ICC in violation of Section 410(a) of the Interstate Commerce Act, 49 U.S.C. § 1010(a). The ICC's Examiner found that SeaTransit's operations fell within the definition of a freight forwarder in Section 402(a) (5) of the Act, 49 U.S.C. § 1002(a) (5), and recommended issuance of a cease and desist order requiring SeaTransit to suspend its operations unless and until it obtained an appropriate permit from the ICC. By decision and order of October 14, 1970, a panel of the ICC acting as an appellate division directed SeaTransit to discontinue its operations by November 28, 1970. The ICC subsequently revised minor particulars of its decision and postponed the effective date of the compliance order to December 28, 1970.

On December 14, 1970, SeaTransit filed a complaint in this court seeking to suspend, enjoin, annul or set aside the ICC's order and requesting the district judge to grant a temporary restraining order enjoining enforcement of the ICC's order pending hearing and determination of this cause by a three-judge court. The district judge granted a temporary restraining order on January 18, 1971 based upon SeaTransit's showing that plaintiff was likely to prevail on the merits of the case, that the order would preserve the status quo pending determination of the merits, that without a stay plaintiff would suffer irreparable injury, that no substantial harm would result to other interested parties from a stay, and that no public interest militated against issuance of such an order. IML SeaTransit Ltd. v. United States, 323 F.Supp. 562, 564 (N.D.Cal. 1971).

The sole question now before this court is whether plaintiff SeaTransit is a freight forwarder under Section 402(a) (5) of the Interstate Commerce Act, 49 U.S.C. § 1002(a) (5) wherein a freight forwarder is defined as follows:

"The term 'freight forwarder' means any person which (otherwise than as a carrier subject to [parts I, II, or III] of this title) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to [part I, II, or III] of this title."

The parties agree that SeaTransit's operations are within the ambit of subsections (A) and (B). SeaTransit challenges only the ICC's finding that it "utilizes," for the whole or any part of the transportation of its shipments, the

services of a Part II motor carrier within the meaning of subsection (C).[1]

SeaTransit is a Utah corporation classified by the Federal Maritime Commission (hereinafter the "FMC") as a non-vessel operating common carrier by water (hereinafter "NVO"). During the times involved in the ICC's investigation, SeaTransit had a tariff on file with the FMC listing port to port rates for movements of shipments from the Port of Oakland to the Port of Hawaii. SeaTransit received shipments destined for Hawaii at its San Leandro terminal[2] from transcontinental motor carriers and from the public generally, although its principal volume of business came from shipments tendered by IML Freight, Inc., its parent corporation.

Upon receipt of shipments, SeaTransit issued its NVO bills of lading to the shippers covering movement of the traffic to Hawaii. SeaTransit would place the shipments in containers at its terminal and prepare a manifest indicating the details of each shipment. The containers which it utilized for this purpose belonged to the vessel operating water carrier which transported the shipments to Hawaii, Matson Navigation Company (hereinafter "Matson"). Matson employed a motor carrier to deliver the empty containers to SeaTransit and to transport the loaded containers to Matson's pier. The motor carrier gave SeaTransit a receipt from Matson for the containers and their contents as manifested. The receipt was one copy of a multicopy Matson bill of lading prepared by SeaTransit to cover the movement of the shipments from its San Leandro terminal to the Hawaiian ports of destination. Upon receipt of the containers, Matson signed the bill of lading listing SeaTransit as consignor and consignee of the consolidated containerized shipments. Matson offered this service pursuant to a tariff on file with the FMC describing an all-water rate.

After Matson deposited the containerized shipments at its Hawaiian docks, SeaTransit employed local Hawaiian motor carriers to segregate the individual shipments from the containers for delivery to the Hawaiian consignees. SeaTransit advanced the charges of the local carriers for the account of its shippers pursuant to the provisions of its tariff on file with the FMC. SeaTransit billed its shippers its port to port charge for the movement of the shipments from its San Leandro terminal to the Hawaiian ports at its published FMC rates as an NVO. Added to the bill was any charge advanced by SeaTransit to the local Hawaiian motor carriers for making delivery to the ultimate Hawaiian consignees.

There is no question that SeaTransit is an NVO whose rates are properly on file with the FMC. The FMC's statutory jurisdiction over NVO's in the foreign and offshore commerce of the United States is established by Section 1 of the Shipping Act of 1916, 46 U.S.C. § 801, which provides in pertinent part:

"The term 'common carrier by water in interstate commerce' means a common carrier engaged in the transportation by water of passengers or property on the high seas or the Great Lakes on regular routes from port to port between one State, Territory, District, or possession of the United States and any other State, Territory, District, or possession of the United States, or between places in the same Territory District, or possession.

---

1. The Federal Maritime Commission, which did not participate in the administrative proceedings before the Commission, has intervened in this action as a plaintiff. Four freight forwarders—Hawaiian Express Service, Inc., Aloha Consolidators & Freight Forwarders, D. C. Andrews International, Inc., and Star Forwarders, Inc.—have intervened in this action to defend the Commission's final order.

2. SeaTransit formerly operated from Oakland, but relocated its operations in San Leandro shortly before the Commission hearings. The service it offered from both locations was identical. For convenience, the court will refer solely to San Leandro since that is where SeaTransit presently conducts its business.

"The term 'common carrier by water' means a common carrier by water in foreign commerce or a common carrier by water in interstate commerce on the high seas or the Great Lakes on regular routes from port to port.

"The term 'other person subject to this chapter' means any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water."

Section 5 of the Intercoastal Shipping Act of 1933, 46 U.S.C. § 845b, provides: "The provisions of this Act are extended and shall apply to every common carrier by water in interstate commerce, as defined in Section 1 of the Shipping Act, 1916." Section 2 of that Act, 46 U.S.C. § 844, provides for filing with FMC "all the rates, fares, and charges for or in connection with transportation between intercoastal points on its own route. . . ."

With the enactment of the Alaskan and Hawaiian Statehood Acts, certain forms of rail, motor and water transportation in these new states became subject to federal regulation. In furtherance thereof, Congress amended the Interstate Commerce Act to implement and effectuate the ICC's jurisdiction over the previously unregulated transportation services of these states. However, the FMC's continuing control over common carriers by water between the ports of these new states and other states was expressly set out in Section 27(b) of the Alaskan Statehood Act, 48 U.S.C. § 27(b), and Section 18(a) of the Hawaiian Statehood Act, 48 U.S.C. § 18(a), the latter section providing:

"Nothing contained in this Act shall be construed as depriving the Federal Maritime Board of the exclusive jurisdiction heretofore conferred on it over common carriers engaged in transportation by water between any port in the State of Hawaii and other ports in the United States or possessions, or as conferring on the Interstate Commerce Commission jurisdiction over transportation by water between any such ports."

Even if SeaTransit is an NVO, however, the question remains whether SeaTransit is also a freight forwarder under Section 402(5) (a). If it is, the ICC's position is that Section 33 of the Shipping Act of 1916, 46 U.S.C. § 832, deprives the FMC of any jurisdiction it might otherwise have. That section provides:

"This Act shall not be construed to affect the power or jurisdiction of the Interstate Commerce Commission, nor to confer upon the Federal Maritime Commission concurrent power or jurisdiction over any matter within the power or jurisdiction of such Interstate Commerce Commission. . . ."

In the ICC's view, SeaTransit is a freight forwarder subject to ICC jurisdiction no matter what it chooses to call itself. *See* Freight Consolidators Cooperative, Inc. v. United States, 230 F. Supp. 692, 698–699 (S.D.N.Y.1964).

The court turns at the outset to the issue of whether SeaTransit "utilizes" the local Hawaiian motor carriers. Section 204(a) (4a), 49 U.S.C. § 304(a) (4a), provides that it shall be the ICC's duty

"(4a) To determine, upon its own motion, or upon application by a motor carrier, a State board, or any other party in interest, whether the transportation in interstate or foreign commerce performed by any motor carrier or class of motor carriers lawfully engaged in operation solely within a single State is in fact of such nature, character, or quantity as not substantially to affect or impair uniform regulation by the Commission of transportation by motor carriers engaged in interstate or foreign commerce in effectuating the national transportation policy declared in this Act. Upon so finding the Commission shall issue a certificate of exemption to such motor carrier or class of mo-

tor carriers which, during the period such certificate shall remain effective and unrevoked, shall exempt such carrier or class of motor carriers from compliance with the provisions of this part, and shall attach to such certificate such reasonable terms and conditions as the public interest may require. At any time after the issuance of any such certificate of exemption, the Commission may by order revoke all or any part thereof, if it shall find that the transportation in interstate or foreign commerce performed by the carrier or class of carriers designated in such certificate shall be, or shall have become, or is reasonably likely to become, of such nature, character, or quantity as in fact substantially to affect or impair uniform regulation by the Commission of interstate or foreign transportation by motor carriers in effectuating the national transportation policy declared in this Act. Upon revocation of any such certificate, the Commission shall restore to the carrier or carriers affected thereby, without further proceedings, the authority, if any, to operate in interstate or foreign commerce held by such carrier or carriers at the time the certificate of exemption pertaining to such carrier or carriers became effective. No certificate of exemption shall be denied, and no order of revocation shall be issued, under this subparagraph, except after reasonable opportunity for hearing to interested parties."

In Motor Carrier Operation in the State of Hawaii, 84 M.C.C. 5 (1960), the ICC exempted Hawaiian motor carriers from Part II regulation under the Act:

"We find that the transportation in interstate or foreign commerce performed by all qualified motor carriers lawfully engaged in operation solely within the State of Hawaii is in fact of such nature, character, or quantity as not substantially to affect or impair uniform regulation by this Commission of transportation by motor carriers engaged in interstate or foreign commerce in effectuating the national transportation policy; provided, however, that if the State of Hawaii makes a determination of the respective intrastate operating rights of such carriers, the exemption granted herein shall not be construed as exempting operations in interstate or foreign commerce any more extensive than those corresponding to the intrastate authorities granted by the State; and that a certificate exempting such operations should be issued, to remain in effect until further order of this Commission."[3]

Notwithstanding this exemption, the ICC's Examiner in this investigation found that these carriers were subject to Part II of the Act within the meaning of Section 402(a) (5):

". . . [T]he operation of the Hawaiian motor carrier effecting delivery of the considered interstate freight is subject to part II of the Act within the meaning of the freight forwarder definition. * * * Webster's Third New International Dictionary defines the word 'subject' as meaning 'to bring under; to bring under control or dominion; to reduce to subservience or submission; to make accountable; or to make one submit to a particular action or effect.' An examination of the more pertinent provisions of the statute upon which the finding in the *State of Hawaii case*, *supra*, was predicated, establishes that the issuance of a certificate of exemption to a motor carrier or class of mo-

3. The Commission's opinion made it clear that because of the particular nature of the Hawaiian motor carriers' insular operations, the Commission should not subject them to its jurisdiction: "Considering all factors, we are persuaded that the exercise of our jurisdiction in the regulation of Hawaiian motor carriers, whose operations in large part might well be characterized as in the nature of pickup and delivery . . . would amount to unwarranted federal regulation of a stub ended, essentially local, operation for no useful purpose." 84 M.C.C. at 31.

tor carriers by the Commission is based on certain findings of fact specified in that section of the Act, and that under certain conditions such certificate of exemption may be revoked. In the latter event, the operation, of course, would require the granting by the Commission of a certificate of public convenience and necessity to operate as a common carrier or of a permit to operate as a contract carrier, pursuant to the provisions of Section 206(a) or 209(a), respectively, of the Act for its continuance. Certainly the requirements for the issuance of a certificate of exemption by the Commission or for the revocation of such certificate, with the latter resulting in the applicability of other provisions of the Act, constitute a sufficient basis for concluding that a carrier is accountable to the Commission, and therefore, within the meaning of Section 402(a) (5), is subject to part II of the Act. To hold otherwise could result, in certain situations, in the exclusion from the regulatory provisions of part IV of the Act operations which otherwise would fully conform to the definition of a freight forwarder, without express provision in the Act for such exclusion. The Act is a remedial statute and, therefore, the applicability of its regulatory provisions should not be narrowly construed." Report and Order, IML SeaTransit, Ltd.—Investigation of Operations and Practices, No. FF–C–29 (June 25, 1970), affirmed and adopted by the Commission, 339 I.C.C. 634 (1970).

Although the ICC itself abandoned that position at the hearing before this court,[4] the defendant intervenors argued that since the ICC granted the Hawaiian motor carriers certificates of exemption and retained the continuing power to revoke those certificates in whole or in part, the Hawaiian truckers were still subject to Part II of the Act. The intervenors conceded that the ICC may exempt them from regulation under the Act, but contended that only Congress can exclude them from the purview of the Act itself. The court rejects this argument. Under Section 204(a) (4a), 49 U.S.C. § 304(a) (4a), the ICC has the power either to "attach to such certificate [of exemption] such reasonable terms and conditions as the public interest may require" or to "revoke all or any part thereof." The ICC has chosen to do neither. Until such time as the ICC actually exercises its power to condition or revoke the certificates of exemption it has granted to the Hawaiian motor carriers, they are not subject to the Act. Therefore, the court concludes that SeaTransit does not utilize a Hawaiian motor carrier subject to Part II of the Act within the meaning of Section 402(a) (5).

The basic issue before the court, the issue upon which resolution of this controversy turns, is whether SeaTransit "utilizes" the California motor carrier employed by Matson to transport the containers between SeaTransit's terminal and Matson's pier, which motor carrier is conceded by all parties to be subject to Part II of the Interstate Commerce Act. Central to this determination is whether Matson and the motor carrier it employs are moving SeaTransit's shipments pursuant to a "through route." In 1962, Congress amended Section 216 of the Interstate Commerce Act by adding subsection (c), 49 U.S.C. § 316(c), to permit water carriers under FMC jurisdiction and motor carriers under ICC jurisdiction to enter into through route and joint rate arrangements:

"(c) Common carriers of property by motor vehicle may establish reason-

4. The Commission may have limited its argument in this court because of the Commission's primary reliance in its decision on the involvement of the California motor carrier in SeaTransit's operations. The court treats the question of the Hawaiian motor carriers both because the Commission adopted the Hearing Examiner's Report, wherein the question is decided adversely to SeaTransit, and because the defendant intervenors press it.

able through routes and joint rates, charges and classifications with other such carriers or with common carriers by railroad and/or express and/or water; . . . As used in this subsection, the term 'common carriers by water' includes water common carriers subject to the Shipping Act, 1916, as amended, or the Intercoastal Shipping Act of 1933, as amended (including persons who hold themselves out to transport goods by water but who do not own or operate vessels) engaged in the transportation of the property in interstate or foreign commerce between Alaska or Hawaii on the one hand, and, on the other, the other States of the Union, and through routes and joint rates so established and all classifications, regulations, and practices in connection therewith shall be subject to the provisions of this chapter."

Because all parties rely to some extent on the provisions of this subsection as support for their respective positions, the court now considers its bearing on the question before it.

■ A through route, a concept which antedates the enactment of Section 216(c), is a continuous line of carriage formed by an arrangement, express or implied, between connecting carriers. The existence of a through route does not depend on the length of the respective hauls by the participating carriers, but rather on the nature of the arrangements between them and their commitments to their shippers. *See* Sea-Land Service, Inc. v. FMC, 131 U.S. App.D.C. 246, 404 F.2d 824, 828, (1968); Alaska Steamship Co. v. FMC, 399 F.2d 623, 626 (9th Cir. 1968). "In short, the test of the existence of a 'through route' is whether the participating carriers hold themselves out as offering through transportation service. Through carriage implies the existence of a through route whatever the form of the rates charged for the through service." Thompson v. United States, 343 U.S. 549, 557, 72 S. Ct. 978, 983, 96 L.Ed. 1134 (1952). Two recent cases, relied upon by the dis-

trict judge in granting temporary relief, shed some light on the effect of Section 216(c) on the litigation at bar.

In Alaska Steamship Co. v. FMC, *supra*, the Ninth Circuit held that upon cancelling its tariff on file with the FMC and filing through route and joint rate tariffs with the ICC, the Alaska Steamship Company, a common carrier by water, properly became subject to ICC regulation. The FMC attacked this supersedure as a "sham, serving to mask an effort at agency-forum shopping," and contended that what was involved was solely pick up and delivery services which were properly included in the water carrier's FMC tariff as "terminal charges."

"The FMC characterizes this operation as 'pickup and delivery,' and says that the charges for this service should be included in the water carrier's tariff as 'terminal charges' under § 2 of the Intercoastal Shipping Act, 46 U.S.C. § 844 (1964). It contrasts such arrangements with those between 'line haul' carriers. It argues that it was the latter type of connection with which Congress was concerned in providing for through routes and joint rates between water and motor carriers. It argues that Congress, in amending the Interstate Commerce Act in this respect, had no intention of making changes in existing practices; rather it was attempting to fill a void—to permit arrangements that could not, without such legislation, be enjoyed. FMC asserts that local pickup and delivery arrangements were available under FMC regulations without the need for creating a 'through route' with a 'joint rate.' As precedent it points to its decision in Matson Navigation Co., 7 F.M.C. 480 (1963). There Matson had engaged local carriers as Matson's agents to perform pickup and delivery service in port areas. Matson paid the carriers the ICC tariff rates and included a charge for this service in its own tariffs. In its decision in that case FMC concluded that as long

as such trucking service was in the nature of 'pickup and delivery' as distinguished from 'line haul,' it did not constitute a through route; that the charge for such service was a 'terminal charge' and that the water carrier's rates remained subject to FMC regulation.

"FMC contends that, consistently with its position in *Matson* we should here construe the term 'through route' (as used by Congress respecting motor and water connections) as not encompassing connections with motor services that can qualify as pickup and delivery, since such connections remain available under FMC regulations." *Id.* 399 F.2d at 625–626.

In rejecting this argument, the court of appeals incorporated into its reasoning the language which plaintiffs cite as controlling and which defendants dismiss as dicta:

"Thus ICC does not dispute FMC's decision in *Matson*. *An arrangement between carriers whereby one employs the other as agent for terminal delivery service, paying that carrier the ICC tariff rate, simply does not entail a joint rate. It does not entail obligations to the shipper such as are found in through routes. It does not present the regulatory problems presented by through-route and joint-rate arrangements.*" *Id.* at 627 (emphasis added).

However, the Ninth Circuit concluded that when arrangements were entered into which did in fact constitute through routes and joint rates and the carriers involved filed appropriate tariffs with the ICC, as in the case before it, Congress intended the ICC to regulate those arrangements.

Similarly, in Sea-Land Service, Inc. v. FMC, 131 U.S.App.D.C. 246, 404 F.2d 824 (1968), the FMC challenged Sea-Land's "redesignation" of its activities from "a port-to-port service, including local motor pick-up and delivery," regulated by the FMC to "joint through water and motor services and rates," joint-

ly performed with a motor common carrier, to be regulated by the ICC. After reviewing the legislative history of section 216(c), the court noted that there was no "mileage limitation" on the ICC's authority to regulate through route arrangements: "The language of the statute makes no distinction between motor carrier participation of line-haul dimensions and motor carrier participation of merely pickup and delivery in the port areas; no distinction between a thousand miles and a few blocks, as long as both motor and water carriers are performing a joint through service." 404 F.2d at 827. Moreover, the fact that the terminal area motor pick-up and delivery was merely "incidental" to the line-haul water transportation was not determinative: "What is required is that both motor and water carriers hold themselves out to the public as participants in a joint transportation endeavor and file appropriate tariff schedules reflecting these joint rates and through services." *Id.*

The court of appeals emphasized that its decision caused no diminution of FMC jurisdiction:

"What is meant by the FMC when it refers to its traditional jurisdiction is regulation of water carrier tariffs which include motor pick-up and delivery service, so-called single-factor or all-water rates. Our decision here is confined to joint through services; it in no way affects all-water tariffs, the regulation of which remains within the authority of the FMC." *Id.*

In resolving the competing claims of regulatory jurisdiction against the FMC, the court of appeals rejected the FMC's argument that there had been no "change" in Sea-Land's activities, which is, in slightly different form, the same argument the ICC makes here:

"Respondent [FMC] argues that there has been no change in Sea-Land's physical activities; that petitioner [Sea-Land] is merely using different nomenclature for the same conduct. This argument is wide of the

mark, for its fails to distinguish the legal significance attaching, on the one hand, where Sea-Land assumes exclusive responsibility for the successful performance of door-to-door transportation, and on the other hand, where Sea-Land is a participant with a motor carrier in a joint undertaking. In, the latter instance, there is a contract of carriage between both carriers and the shipper (or consignee), and both carriers are jointly and severally liable." *Id.* at 827–828.

The crucial factor in both of these recent decisions, and the crucial factor in the case before this court, is whether the carriers hold themselves out to the public as joint participants in a through route.

█ Neither of the decisions the court has discussed holds, and the court declines to hold here, that the FMC no longer has jurisdiction over water carrier tariffs which include motor carrier pick-up and delivery services.[5] In the case now before the court, SeaTransit is not a participant in a through route arrangement. SeaTransit contracts with Matson to utilize its all-water service, including pick-up and delivery, between its San Leandro terminal and Matson's docks in Hawaii. This service is offered pursuant to a tariff on file with the FMC, not a through route tariff on file with the ICC. In short, neither SeaTransit nor Matson has entered into any joint rate or through route arrangement with the motor carrier employed by Matson to provide terminal pick-up and delivery services. In reaching this conclusion, the court adheres to the view of the courts in *Sea-Land* and *Alaska Steamship*, as well as the single district judge who granted a temporary restraining order against the ICC in this case, that the type type of rate the water carrier and the motor carrier use to move a shipment is determinative. If Matson and the motor carrier it employs for terminal pick-up and delivery entered into through route and joint rate arrangements, and filed an appropriate tariff with the ICC, SeaTransit might then "utilize" a Part II motor carrier within the meaning of Section 402(a) (5). This is a question the court need not and does not now decide. However, so long as Matson offers an all-water service pursuant to a tariff on file with the FMC, the mere fact that it employs a Part II motor carrier for terminal pick-up and delivery does not satisfy the requirements of a through route.[6]

5. The 1962 amendment of Section 216 of the Interstate Commerce Act did not abolish such jurisdiction *sub silentio*. *See* Matson Navigation Co.—Container Freight Tariffs, 7 F.M.C. 480, 491–92 (1963) :

"A part of this containerized operation is a pickup and delivery service which is physically performed by common carriers by motor vehicle who act as agents for Matson. Throughout the entire operation Matson is the principal charged with the direction of and liability for the services performed. The service is offered by Matson in its capacity as a common carrier by water and it is in this capacity that Matson is subject to the regulatory jurisdiction of this Commission . . . .. We are not saying, nor do we mean to imply, that through their contractual relations with Matson the motor carriers operating as Matson's agents somehow remove themselves from the jurisdiction of the Interstate Commerce Commission. They remain subject to the Interstate Commerce Act and all its requirements applicable to such carrier. Nor are we attempting to exercise any concurrent jurisdiction over these motor carriers such as is precluded by section 33 of the Shipping Act. We are merely subjecting to regulation a service authorized by the provisions of the Shipping Act offered by a common carrier subject to that Act. If a portion of that service is conducted by a carrier subject to another agency's regulation and the carrier performs that service in violation of the laws administered by that agency, that is a matter for the agency concerned. Practical difficulties and problems may arise but jurisdictional conflicts should not."

6. The court in Hawaiian Express Service, Inc. v. Pacific Hawaiian Terminals, Inc., Civ. No. 47963 (N.D.Cal.1971), also relies on Judge Zirpoli's earlier opinion in

The court cannot find any other basis on which to conclude that SeaTransit utilizes a Part II motor carrier within the meaning of Section 402(a) (5). The ICC makes an elaborate argument that even if there is no through route SeaTransit still utilizes a Part II motor carrier because it must then contract separately with the trucker, pay the trucker its individual rate, and hold the trucker responsible for its own acts. The difficulties with this position are obvious: First, SeaTransit does not contract separately with the trucker; it contracts exclusively with Matson. Second, SeaTransit does not pay the trucker its individual rate; it pays Matson its all-water rate, which includes the trucker's terminal pick-up and delivery charges. Third, notwithstanding whatever legal rights SeaTransit may have against the Part II motor carrier Matson employs, the court cannot conclude that the mere existence of such rights is determinative on the issue of whether SeaTransit utilizes the motor carrier. In the court's view, the word "utilize" in Section 402 (a) (5) contemplates a more substantial commercial connection between Sea-Transit and the Part II motor carrier than the tenuous legal relationship the ICC urges is sufficient.[7]

Unless and until SeaTransit actually utilizes a Part II motor carrier, it is not a freight forwarder. As long as Sea-Transit conducts its operations in the manner described herein, it does not fall within the ambit of Section 402(a) (5) (C): It utilizes a Part II motor carrier neither indirectly, by using a water carrier which files a tariff describing a through route with the ICC, nor directly, by itself employing a Part II motor carrier to perform transportation services for its customers

What is at issue here is fundamentally a jurisdictional dispute between two agencies of the United States Government. The court recognizes that what it decides today may foster some disparity in the regulation of transportation entities offering substantially similar services to mainland shippers and Hawaiian consignees, but it does not perceive the sort of jurisdictional conflict which Section 33 of the Shipping Act resolves in favor of the ICC. Non-vessel operating water carriers, like SeaTransit, are subject to regulation by the FMC; freight forwarders are subject to regulation by the ICC. To the extent that this scheme causes any lack of efficiency or uniformity in the complementary regulatory activities of the ICC and the FMC, the solution is for Congress to decide. It is not for this court to arrogate to itself the responsibility for apportioning jurisdiction between these two agencies.

It is hereby ordered that defendant Interstate Commerce Commission and its agents and employees are permanently enjoined from entering or enforcing any order directing plaintiff IML SeaTransit, Ltd. to cease and desist from conducting operations as a non-vessel operating water carrier between San Leandro, California and Hawaii so long as such operations are conducted in the manner described in this opinion.

this case: 323 F.Supp. 562 (N.D.Cal. 1971).

7. *See* Star Forwarders, Inc. v. Intermountain Fast Freight, dba Hawaiian Cargo Expediters, Docket No. FF–C–31 (1970) and Star Forwarders, Inc. v. Hawaiian Freight Lines, Inc., Docket No. FF–C–33 (1970). In both cases, the transportation entities the ICC found to be freight forwarders arranged for the motor transportation of the shipper's cargo from the shipper's premises to the forwarder's assembly station. The fact that SeaTransit does not itself employ a Part II motor carrier to provide such a service to its customers is a crucial difference between SeaTransit's operations and a freight forwarder's. If SeaTransit did provide such a service, it would "utilize" a Part II motor carrier within the meaning of Section 402(a) (5).