**LONE STAR PACKAGE CAR CO., et al.,
Plaintiffs,**

v.

**UNITED STATES of America, et al.,
Defendants.**

**Civ. A. No. 4–355.**

United States District Court,
N. D. Texas,
Fort Worth Division.

Feb. 19, 1974.

**1216**

Richard L. McGraw, Houston, Tex., Giles Morrow, George H. Leonard, New York City, Theo. R. Schneider, St. Louis, Mo., for plaintiffs and intervening plaintiff Freight Forwarders Institute.

Francis M. Shea, William H. Dempsey, Jr., Washington, D. C., Frank Finn, Jr., Dallas, Tex., Walter J. Myskowski, W. Graham Claytor, Jr., William D. McLean, James A. Bistline, Washington, D. C., for intervening plaintiffs Southern Railway Co. and others.

Edwin M. Zimmerman, John H. D. Wigger, Dept. of Justice, Washington, D. C., Melvin M. Diggs, U. S. Atty., Fort Worth, Tex., for the United States.

Robert W. Ginnane, Gen. Counsel, Fritz R. Kahn, Associate Gen. Counsel, Nahum Litt, Atty., Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Before GEE, Circuit Judge, and BREWSTER and WOODWARD, District Judges.

GEE, Circuit Judge:

This proceeding was commenced by the plaintiff freight forwarders to set aside and amend the order of the Interstate Commerce Commission in Ex Parte No. 230, Substituted Service—Charges and Practices of For-Hire Carriers and Freight Forwarders (Piggyback Service), reported at 322 I.C.C. 301. That proceeding broadly investigated trailer-on-flatcar (TOFC) or piggyback service as it had developed, a practice under which, generally speaking, truck-trailers and/or their contents are hauled by rail. The Commission's order ascertained five types of such service, known as Plans I through V. Plaintiffs attack the Plan I practice [1] only, asserting that it is unauthorized and, indeed, specifically prohibited by statute. By intervention, Southern Railway System and the national association of the freight forwarding industry joined plaintiffs, while various railroads and motor carrier associations intervened in support of the Commission.

Essentially, the Plan I practice is an arrangement worked out between a motor carrier and a railroad in which the railroad undertakes to haul trailers owned by the motor carrier from one point to another, both of which are located on the motor carrier's ICC-authorized route. The motor carrier pays the railroad an amount agreeable to both parties, which is usually a lump sum on a per-trailer basis. The shipper, who contracts only with the motor carrier, pays to the motor carrier the highway transportation rate published by the mo-

---

1. Informally defined by the Commission as "Railroad movement of trailers or containers of motor common carriers, with the shipment moving on one bill of lading and billing being done by the trucker. Traffic moves under rates in regular motor carrier tariffs." 322 I.C.C. at 304.

tor carrier. The effect is that the parallel rail route is substituted for the motor carrier's authorized highway route between the two points; the railroad is used in lieu of the highway.

Each motor carrier possesses a special directory which contains a list of the points on the motor carrier's authorized routes between which the substituted piggyback service is available. The motor carrier then has the option of using this substituted rail service in lieu of transporting by motor over his authorized route. The shipper may veto but may not require the use of TOFC. The TOFC service may be used even though it embraces the entire line-haul movement. A limitation is that TOFC service may not be employed where the TOFC movement is less than 85% of the distance over the all-highway route.

Plan I was approved by the Commission on the basis that it was within the purview of § 216(c) of the Interstate Commerce Act, 49 U.S.C. 316(c). Section 216(c) authorizes motor carriers to establish by independent agreement "through routes" and "joint rates" with other railway, express, or water carriers as long as the participating carriers make "just, reasonable, and equitable divisions" of the joint rates established among themselves.

As the case presently stands, at least one of plaintiffs' original major contentions has fallen by the way. In light of the decision in American Trucking Associations v. Atchison, T. & S. F. Ry. Co., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967), plaintiffs no longer contend that motor carriers under Plan I are operating illegally as freight forwarders.

The remaining contention to which plaintiffs give primary emphasis is that Plan I does not provide a lawful joint-rate, through-route arrangement within the meaning of § 216(c) of the Interstate Commerce Act.[2] Little force remains in the aspect of this argument that the only proper through-route is that which commences at a point on one carrier's line and terminates at a point on another's. Cf. Sea-Land Service, Inc. v. Federal Maritime Commission, 131 U.S.App.D.C. 246, 404 F.2d 824 (1968); Alaska Steamship Company v. Federal Maritime Commission, 399 F.2d 623 (9th Cir. 1968). Indeed, it well may be that plaintiffs no longer insist upon this aspect. What they do insist upon is an argument derived from a footnote observation in *American Trucking Associations* that ". . . the District Court's exception for open-tariff TOFC where the railroad consents cannot be justified as based upon the voluntary through route and joint rate provision of the Act."[3] Plaintiffs view this as a holding that open-tariff TOFC does not involve through routes. Since under § 216(c) a Plan I service must involve such a route, and since from some vantage points Plan I TOFC service and "open-tariff" TOFC service have the same relevant characteristics, Plan I cannot, it is

2. § 216(c):
"Common carriers of property by motor vehicle may establish reasonable through routes and joint rates, charges, and classifications with other such carriers or with common carriers by railroad and/or express and/or water; and common carriers of passengers by motor vehicle may establish reasonable through routes and joint rates, fares, or charges with common carriers by railroad and/or water. In case of such joint rates, fares, or charges it shall be the duty of the carriers parties thereto to establish just and reasonable regulations and practices in connection therewith, and just, reasonable, and equitable divisions thereof as between the carriers participating therein which shall not unduly prefer or prejudice

any of such participating carriers. As used in this subsection, the term "common carriers by water" includes water common carriers subject to the Shipping Act, 1916, as amended, or the Intercoastal Shipping Act of 1933, as amended (including persons who hold themselves out to transport goods by water but who do not own or operate vessels) engaged in the transportation of property in interstate or foreign commerce between Alaska or Hawaii on the one hand, and, on the other, the other States of the Union, and through routes and joint rates so established and all classifications, regulations, and practices in connection therewith shall be subject to the provisions of this chapter."

3. 387 U.S. 414, fn. 8, 87 S.Ct. 1617.

urged, involve through routes either. We are unable to agree.

In the first place, the argument rests upon too slender a base, places more pressure upon a rather obscure and cryptic footnote comment than it can properly be required to bear. In the second, the entire thrust of the footnote is to observe that motor carrier use of open-tariff TOFC is simply and fundamentally so different an arrangement from the voluntary through route, joint rate one that it must be justified—if at all—on some other basis than § 216(c).

■ Finally, plaintiffs urge upon us the unfairness of the advantage granted motor carriers over freight forwarders by Plan I arrangements. If this be so, the argument must be addressed to Congress; it is the statute which prohibits freight forwarders from participating with railroads in such arrangements. Acme Fast Freight v. United States, 30 F.Supp. 968 (S.D.N.Y.1940), aff'd mem., 309 U.S. 638, 60 S.Ct. 810, 84 L.Ed. 993 (1940).

Having dealt with plaintiffs' presently active contentions, and finding no merit in the others, we conclude that the relief sought by plaintiffs must be denied.