## ACME FAST FREIGHT, Inc., et al. v. UNITED STATES et al.

District Court, S. D. New York.
Jan. 8, 1940.

Clark, Carr & Ellis, of New York City
(John R. Turney, George A. Ellis and

Paul A. Crouch, both of New York City, of counsel), for complainants.

Thurman Arnold, Asst. Atty. Gen., Elmer B. Collins, Sp. Asst. to Atty. Gen., and John T. Cahill, U. S. Atty., of New York City, for defendant United States.

Daniel W. Knowlton, Chief Counsel, and J. Stanley Payne, Asst. Chief Counsel, both of Washington, D. C., for defendant Interstate Commerce Commission.

Before AUGUSTUS N. HAND, Circuit Judge, and LEIBELL and MANDEL-BAUM, District Judges.

AUGUSTUS, N. HAND, Circuit Judge.

This is a suit (1) to set aside an order of the Interstate Commerce Commission refusing to issue a certificate of public convenience and necessity to certain of the complainants herein and to enforce by writ of mandatory injunction the exercise of jurisdiction on the part of the Commission of the application for such a certificate, and (2) to set aside a certain order of the Commission rejecting and striking from its files certain joint tariffs of complainants.

The orders were issued in a proceeding initiated by filing with the Commission an application for a certificate or certificates of public convenience and necessity authorizing the continuance of the operations conducted by them on and after June 1, 1935. The application was made under the socalled "grandfather" clause of Section 206(a) of the Motor Carrier Act, 1935, 49 U.S.C.A. § 306(a). That section makes it unlawful for any "common carrier by motor vehicle" subject to the provisions of the Act to engage in any interstate or foreign operation on any public highway unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations, subject to the following proviso, which contains the socalled "grandfather" clause:

"Provided, however, That, subject to section 210 [310], if any such carrier * * * was in. bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, * * the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate

was made to the Commission as provided in paragraph (b) of this section and within one hundred and twenty days after this section shall take effect [October 1, 1925]  *  *  *".

The six applicants before the Commission were Acme Fast Freight, Inc., Acme Transfer & Storage Company, Inc., Atlas Freight, Inc., Chaffee-Shippers Service, Inc., Shippers Service Express, Inc., and Southwestern Carloading Company. All the capital stock of these six companies is owned by T. A. B., Incorporated, a holding company. Acme Fast Freight, Inc., is called the controlling company; the other five companies are operated as divisions of that corporation.

After hearings, Division 5 of the Commission issued a report in which it held that two of the six applicants, to wit, Shippers Service Express, Inc., and Acme Transfer & Storage Company, Inc., owning and operating trucks, were engaged as common carriers by motor vehicle and were entitled to certificates, but that the other four applicants, not owning or operating any motor vehicles and not conducting any motor vehicle operations, were only freight forwarders and, as such, were not engaged as "common carriers by motor vehicle" nor as contract carriers within the purview of the Motor Carrier Act, but were entitled to licenses as brokers upon compliance with the requirements of Section 211(c) of that Act, 49 U.S.C.A. § 311(c). Commissioner Eastman filed a dissent in respect to the right' of the forwarders to brokers' licenses. The Division also stated that as they were not "common carriers by motor vehicle" they could not obtain services from common carriers by motor vehicle at less than the published rates and could not establish divisions of joint rates with the latter.

Division 5 was reversed as to the portion of its report in favor of granting brokers' licenses and otherwise affirmed and the tariffs filed by the four forwarding companies showing joint rates between them and motor carriers were thereafter rejected and stricken from the files.

A summary of the facts by Division 5, which met the final approval of the Commission, was in substance as follows:

The forwarding companies collect, consolidate, ship and distribute less-than-carload lots of freight and express shipments throughout the entire United States, utilizing the services of carriers by motor

970

vehicle, rail and water, including the motor service of the two applicants actually owning and operating trucks. Consolidation and distribution stations for the collection and delivery of such freight and express shipments are maintained by these companies on leased property in 136 secondary cities, each serving territory that varies in area with the size and commercial importance of the city in which the station is situated. Key concentration and distribution stations are maintained on leased property in 60 other large cities, which serve as major concentration and distribution stations for groups of secondary stations, break-bulk and reshipment stations for through consignments and local consolidation and distribution stations. These key stations are leased in the name of Acme Fast Freight, Inc., and, when situated in the territory of any of the other companies, are also utilized by the latter in connection with their operations. The companies employ approximately 225 solicitors and general agents.

The basic principle underlying the operations of the companies is the concentration of numerous individual small shipments within the shortest possible distances so that the economy and expedition obtainable by handling consolidated carload lots by rail or water and truck-load quantities by motor may be gained for the larger part of the haul. Shipments assembled at applicants' smaller stations are generally moved by the shortest possible routes to or through key stations and to local stations by their own local vehicles or by railroads, steamships or motor vehicles operated by others. The choice of the carriers utilized always rests with the forwarding companies and not with the shipper. The forwarders use only motor carriers which they believe have complied with the requirements of the Act.

In addition to the movement of less-than-carload traffic at rates per pound and per hundred pounds, a package division handles parcels in expedited service at pound rates in consolidated shipments. Commodities in bulk like grain, oil, coal, sand, iron and steel are not accepted for shipment. Traffic ordinarily is handled from the premises of the shipper to the premises of the receiver. Where collection service is provided, the shipper notifies the nearest agent of the forwarding companies and receipts for the goods by either a bill of lading of the forwarding company or an interim receipt which later is exchanged for such a bill of lading. At times collection service at point of origin is not performed by the forwarder's carrier, although it is generally available and specified in the forwarder's tariffs. In such cases, the forwarder's custody of the goods begins at its receiving station instead of at shipper's premises.

The individual shipments are consolidated by the forwarding company into carload or truck-load lots for transportation by either rail, steamship or motor, depending upon which will provide the desired service to points at which are located the forwarding companies' destination or distribution stations, in the case of goods going direct to such points, or to intermediate concentration stations, as break-bulk or transfer points, where shipments are to go beyond. In the latter instances, re-sorting and reconsolidation occur before further shipment to ultimate destination. Motor movements are under way bills of the forwarding company, but bills of lading, issued by Acme Fast Freight, Inc., accompany the shipments to the destination stations and the forwarding company receives from the motor carrier a receipt for the property transported. Railroads and water carriers use their own billing for their portion of the hauls, apart from forwarder's billing. There is no contractual relation between the shipper and the actual carrier. Generally the shipper does not know the carrier, other than the forwarder, by which its goods are to be transported or whether its shipment will be transported by a motor, rail or water carrier, or some combination thereof.

When the forwarder uses the services of rail or water carriers, it pays regular tariff rates therefor and acts as both consignor and consignee of the shipment. Prior to April 1, 1936, it utilized the services of both common and contract motor carriers, in general, at charges agreed upon by contract. Thereafter it filed tariffs with the Commission naming the rates applicable on all traffic handled by it regardless of the type or types of transportation utilized, and obtained concurrences in these tariffs from the majority of the motor carriers serving it. These concurrences rested on oral contracts providing for a division of the forwarders' published rates on a basis independent of the rate and charges carried in tariffs of the motor carriers. In a few instances the forwarder has paid the motor carriers their published tariff rates.

Nearly 2,100 motor carriers carry for the forwarders, at least 94 per cent of which are common carriers. The status of the remainder is uncertain. All these motor carriers hire and discharge their own employes, select the type of vehicle required to transport the shipments, furnish and maintain their equipment, employ their own drivers and carry the goods of others. They are required only to serve the forwarder and make the necessary connections with other carriers.

The rates and charges published by the forwarders and filed with the Commission are generally those that were prescribed under the code of fair competition of the domestic freight-forwarding industry when the National Recovery Administration was functioning—applicable whether motor, rail or water carriage or a combination thereof is used.

The bill of lading issued by the forwarder follows the form prescribed by the Commission for rail carriers and includes the additional clause that the forwarder shall have exclusive custody and control of the shipment in transit and may determine the route, instrumentality and method of transportation. The forwarder assumes full responsibility for the shipment from the time it is received by it until it is delivered at the receiver's door or some other designated place. Final delivery is made by local motor carriers, who use the forwarding companies' documents in taking receipts for the goods and in collecting the charges thereon. Claims for damages are filed against the forwarder and the latter carries insurance against loss of the property transported which is independent of that maintained by carriers whose services are utilized.

The six companies which brought suit sought to obtain, if possible, a single certificate covering not only the direct operations of the two companies which transport goods in their own trucks but also the indirect operations of the four forwarding companies which act as collectors, consolidators, forwarders and distributors and utilize the services of carriers by rail, water and motor vehicles. The six companies are owned and operated as a single business unit and are treated as operating divisions of Acme Fast Freight, Inc. If the certificate should be granted in its preferred form it was planned to provide for the acquisition by Acme Fast Freight, Inc., of the entire capital stock of the other companies and the subsequent dissolution of those corporations.

On July 12, 1938, the Commission entered its order denying the application of the forwarder-complainants for a certificate of convenience and necessity which would authorize the continuance of their "indirect" operations. In the report of the Commission accompanying that order it was stated that joint tariffs such as we have referred to were unlawful unless the forwarders had the status of express companies. In October 1938 in "Freight Forwarding Investigation", 229 I.C.C. 201, it was held that forwarding companies were not express companies.

Thereafter various truck complainants filed a petition to intervene, for a rehearing and for a broadening of the issues and parties. This application was denied, but the Commission, on its own motion, directed all the complainants to show cause why joint tariffs should not be stricken from the files. On July 24, 1939, after a hearing upon the rule to show cause the Commission, under its order in which it found that the forwarders were not subject to the Act and that carriers subject thereto might not lawfully make joint rates with them, ordered the joint tariffs stricken from the files.

We hold that the Commission was right both (1) in refusing to issue a certificate of public convenience and necessity to the forwarders and (2) in striking from its files the joint tariffs filed by Acme Fast Freight Inc.

The business of forwarders is to collect small shipments of goods, consolidate them and then reship them in bulk. In their business they employ rail and water carriers and also trucks. In their railroad operations, which are the larger part of their business, their profit is derived from the spread between the carload rates under which they ship and the less-than-carload rates which the owner would have to pay. In their truck operations their profit is derived from a division of freight receipts between themselves and truck companies. There is no showing that they have paid the railroads less than the published rates of the latter—indeed the record is to the contrary—but their arrangements with the truck companies involve a sharing in the charges of the latter, of which the joint rate schedules are the evidence.

The Commission declined to grant a certificate of convenience and necessity to the four forwarders on the ground that they were not engaged as common carriers by motor vehicle within the purview of the Motor Carrier Act. This seems justified by Sec. 203(a) (14), 49 U.S.C.A. § 303(a) (14), which defines a common carrier by motor vehicle as any person "who * * * undertakes, whether directly or by a lease or any other arrangement, to transport * * any class or classes of property, for the general public in interstate or foreign commerce by motor vehicle for compensation, whether over regular or irregular routes, including such motor vehicle operations of carriers by rail or water, and of express or forwarding companies, except to the extent that these operations are subject to the provisions of part I [chapter 1]."

The foregoing subdivision is the only place where forwarding companies are mentioned in the Motor Carrier Act and the words refer only to their "motor vehicle operations". Accordingly the Commission granted a certificate to the two complainants who were directly engaged in such operations and declined to grant it to the four who acted as forwarders simpliciter.

It is argued that the words in Section 203(a) (14) defining a common carrier by motor vehicle as any person who "undertakes, whether directly or by a lease or any other arrangement, to transport * * any class or classes of property, for the general public in interstate or foreign commerce by motor vehicle for compensation" are broad enough to include forwarders which do not carry merchandise directly. But the words "by a lease" refer to cases where goods are transported by vehicles not owned but held under lease, and the words "by * * * any other arrangement", under the rule of ejusdem generis, should be taken to involve some similar means whereby a carrier operates in propria persona or through its agents and not through independent contractors. A further reason why forwarders not directly engaged in the carriage of goods should not be held common carriers within the meaning of the Act is that such forwarders have done a large business for years and have never been subjected to control by the Commission. In Lehigh Valley R. R. Co. v. United States, 243 U.S. 444, 37 S.Ct. 434, 61 L.Ed. 839, they were held to be shippers and as such were forbidden to receive any allowance from rail carriers with which they contracted for carriage. Cf. Great Northern Ry. v. O'Connor, 232 U.S. 508, 514, 34 S.Ct. 380, 58 L.Ed. 703; Merchants Warehouse Co. v. United States, 283 U.S. 501, 51 S.Ct. 505, 75 L.Ed. 1227, and Baltimore & Ohio R. Co. v. United States, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318.

The provision of Section 206(a) that no motor common carrier "shall engage in any interstate or foreign operation on any public highway" without a certificate further indicates that indirect operations of forwarders through independent carriers are not within the scope of the Act. It can hardly be said that a forwarding company is engaged in "operation" on a "public highway" when it contracts for transportation thereon by independent connecting carriers.

There is no foundation for the claim that the four forwarders here are motor carriers as to less-than-carload lots for they employed licensed carriers to gather and carry the separate lots just as they employed trucking companies to carry consolidated lots.

The Commission referred with approval to the statement of Division 5 (amended complaint, Exhibit 2) that the complainants' contention is inconsistent with the history and apparent purposes of the Motor Carrier Act. We quote the pertinent language because it sets forth what is perhaps the strongest reason for holding that the indirect operations of the four forwarders do not come within the Act: "There is nothing in the reports or statements of the proponents of the measure, nor in the reports of the congressional committees, to indicate that regulation of forwarding companies as motor carriers was contemplated, and there are indications to the contrary. It is evident, also, that the forwarding companies were not aware that such regulation was proposed. If Congress had intended to include these companies and all of their operations within the definition of common carrier by motor vehicle as it appears in the act, would it not have made this intention clear in explicit and unmistakable language instead of leaving it for discovery only through such a process of interpretation as applicant has followed?"

The fact that the status of forwarding companies is under consideration in the Senate and that at the last Session of

Congress a bill was passed in the House subjecting such companies to regulation by the Commission suggests that they have not hitherto been subject in law to a jurisdiction that has not been exercised in fact.

While the four forwarding companies are doubtless responsible to their customers as common carriers at common law we think it clear that none of them is "a common carrier by motor vehicle" within the meaning of the Motor Carrier Act and that the certificate of public convenience and necessity was rightly denied.

■ The four forwarding companies are chiefly interested in the right to share in joint rates with the truck companies. This right we think they do not possess if, as we have held, they are not "common carriers by motor vehicle" unless they are express companies. They contend that they have the right to establish joint rates with the truck companies as express companies.

Section 1 (3) of Part I of the Interstate Commerce Act, 49 U.S.C.A. § 1(3), provides that as used therein the term " 'common carrier' * * * shall include * * * express companies * * * and all persons * * * engaged in such transportation * * * as common carriers for hire"; and that: "The term 'transportation' * * * shall include * * * all instrumentalities and facilities of shipment or carriage, irrespective of ownership * * and all services in connection with the receipt, delivery * * * storage, and handling of property transported."

Section 216(c) of the Motor Carrier Act, 49 U.S.C.A. § 316(c), provides that: "Common carriers of property by motor vehicle may establish reasonable through routes and joint rates * * * with other such carriers * * * by railroad and/or express and/or water."

Section 217(a), 49 U.S.C.A. § 317(a), provides for the filing by motor carrier of tariffs showing all the charges for transportation between points on its own route and on the route of any other such carrier, or on the route of any common carrier by railroad "and/or express."

■ While the mode of transportation employed by forwarders is analogous to that of express companies the Commission has held that they are not express companies and we agree. Perhaps the distinctions of the Commission between express companies and forwarders based on the fact that express companies retain custody of the goods, ship the merchandise on passenger trains and charge higher rates than forwarders are not of great moment. Express companies, however, were brought under the Interstate Commerce Act by the Hepburn Amendment in 1906, 34 Stat. 584, and there has been a long course of subsequent administrative practice in which forwarding companies have been treated as shippers rather than as express companies. This practice and the enactment of the Motor Carrier Act without any provision bringing forwarders under it except when they are engaged in "motor vehicle operations" satisfies us that the Act does not apply to them either as express companies or otherwise.

■ But the forwarders contend that even if within the meaning of the Act they are neither common carriers by motor, nor express companies, they may nevertheless establish joint rates because they are not prohibited from so doing by Section 216(c). That contention seems to us without merit. The section prescribes under what circumstances there may be joint rates and we cannot suppose that its provisions are not exclusive.

The complainants further rely on the decisions in United States v. Erie Railroad, 236 U.S. 259, 35 S.Ct. 396, 59 L.Ed. 567, and Texas & Pac. Railway v. Interstate Commerce Com., 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940, as giving support to their claim to joint tariffs. But while under those decisions carriers by motor vehicle would doubtless be allowed to share in joint rates with similar carriers operating in foreign countries the Supreme Court has never suggested that joint rates may be established by a forwarder who is not engaged in actual transportation. It has consistently treated forwarders as shippers. Lehigh Valley R. Co. v. United States, 243 U.S. 444, 37 S.Ct. 434, 61 L.Ed. 839; Great Northern Ry. v. O'Connor, 232 U.S. 508, 34 S.Ct. 380, 58 L.Ed. 703; Merchants Warehouse v. United States, 283 U.S. 501, 51 S.Ct. 505, 75 L.Ed. 1227.

Finally complainants say that the Commission was without jurisdiction to strike their tariffs from its files. This contention is based on the recent decision in Powell v. United States, 300 U.S. 276, 57 S.Ct. 470, 81 L.Ed. 643. There the Seaboard Air Line had extended its line to Fort Benning without obtaining a certificate of convenience and necessity from the Commission

in violation of Section 1(18) of the Interstate Commerce Act, 49 U.S.C.A. § 1(18). The Seaboard filed rate tariffs covering Fort Benning. Thereafter the receiver of the Central of Georgia Railway Company initiated a proceeding before the Commission which ordered the tariffs stricken from the files. The Supreme Court held that this might not be done because Section 1 (20) afforded the only remedy for violations of Section 1(18) and that remedy was a suit to enjoin the operation of the extension and not a proceeding before the Commission itself. As the Commission was without authority to determine violations of Section 1(18) it could not grant the ancillary relief of striking the tariffs from its files.

In the present case Section 217(a) of the Motor Carrier Act provides that tariffs covering joint rates authorized under Section 216(c) may be rejected by the Commission when they are "not in consonance with this section * * *". The Commission acted under the express authority of the statute in striking the tariffs from its files.

For the foregoing reasons we hold that the orders of the Commission were proper and direct that the bill be dismissed and that the motion for a temporary injunction be denied, but without costs.

Submit proposed findings within ten days. These are only for the guidance of the court and are not to be made part of the record.