HAWAIIAN EXPRESS SERVICE, INC.,
a corporation, Appellant,

v.

PACIFIC HAWAIIAN TERMINALS,
INC., a corporation, et al.,
Appellees.

No. 72–1696.

United States Court of Appeals,
Ninth Circuit.

Feb. 20, 1974.

Daniel W. Baker (argued), of Handler, Baker & Greene, San Francisco, Cal., for appellant.

Carl H. Fritze (argued), of Russell & Schureman, Los Angeles, Cal., for appellees.

Before TRASK, GOODWIN, and SNEED, Circuit Judges.

ALFRED T. GOODWIN, Circuit Judge:

Hawaiian Express Service, Inc., a freight forwarder authorized by the Interstate Commerce Commission to operate in the San Francisco-Hawaii trade, sued under 49 U.S.C. § 1017(b)(2) to enjoin Pacific Hawaiian Terminals, Inc., from offering transportation services which Hawaiian Express contends amount to "freight forwarding" under the Interstate Commerce Act § 402(a)(5), 49 U.S.C. § 1002(a)(5). The district court denied relief, and Hawaiian Express appeals.

With the exception of the degree of Pacific's utilization of motor common carriers, most of the material facts are covered by stipulation. The crucial question is one of law. We have conclud-

ed that the relevant legislative history requires an interpretation of the statutes which brings the activities complained of within the regulatory scope of the I.C.C., and accordingly reverse.

Pacific operates pursuant to a tariff on file with the Federal Maritime Commission. As a "non-vessel-operating" common carrier by water, Pacific contends that its services are not subject to I.C.C. regulation. Because some of Pacific's activities are competitive with those of Hawaiian Express, and because a resolution of the dispute involves the drawing of lines within the grey area between transportation activities which clearly are subject to I.C.C. regulation and those which clearly are not, we believe it will be helpful to set out the facts in some detail.

Shippers wishing to employ Pacific's services from the San Francisco Bay Area to Hawaii either bring their freight to Pacific's San Francisco terminal or call Pacific and request that the freight be picked up. In the latter case, the shipper is advised that freight can be brought to Pacific's terminal by a carrier of the shipper's choice, or it can be brought to the terminal by a motor carrier arranged for by Pacific. When Pacific arranges the pickups, it calls one of several motor common carriers, which operate under certificates issued under Part II of the Interstate Commerce Act.

After shipments are received at Pacific's San Francisco terminal, they are sorted and loaded into container boxes (trailers) furnished by Matson Navigation Company (Matson) or Seatrain Lines California (Seatrain). Pacific then prepares a cargo manifest showing the 30 to 50 individual shipments loaded into each container. Pacific also prepares ocean bills of lading naming Pacific as both consignor and consignee, and listing Pacific's San Francisco terminal as origin and the Hawaiian address of a Hawaiian motor carrier as destination.

When the containers are loaded and ready to be shipped to Hawaii, Pacific calls either Matson or Seatrain and requests that it pick up the containers and deliver them to the appropriate pier. If the containers are to be transported to the Matson pier, the pickup and delivery service is provided by Encinal Terminals, operating under a Part II motor common carrier certificate filed with the I.C.C. If the containers are to be transported to the Seatrain pier, Walkup's Merchant Express, also a Part II motor carrier, provides the transportation. Rates charged for the latter service are published as part of Seatrain's joint freight tariff filed with the I.C.C. Matson and Seatrain pay Encinal Terminals and Walkup's Merchant Express for local ground transportation. Charges assessed Pacific for the delivery and pickup of containers and shipment to Hawaii are set forth in Matson Navigation Company Westbound Container Freight Tariff No. 14–A, FMC No. 137, filed with the Maritime Commission, and Seatrain Lines California Joint and Proportional Freight Tariff No. 500, I.C.C. No. 1, filed with the I.C.C.

At the Matson or Seatrain piers in Hawaii, containers are unloaded by the water carrier and picked up by Pacific's Honolulu agents, who transport them to their terminal, break bulk, and unload the containers. These agents are motor carriers which have certificates of exemption from I.C.C. regulation, Ex Parte MC–59, Motor Carrier Operations in the State of Hawaii, 84 M.C.C. 5 (1960), and whose rates are filed with the Public Utilities Commission of Hawaii.

Pacific advertises its services as "Freight Forwarding," and bills of consignors either from the point of origin or from Pacific's San Francisco terminal to Hawaii.

It was also stipulated that Pacific provided identical service to that which was rendered by Hawaiian Express and other authorized freight forwarders, at least to the extent of consolidating shipments, turning the containers over to Matson or Seatrain, and breaking bulk in Hawaii.

■■ I.C.C. jurisdiction to regulate freight forwarders is undisputed. See Interstate Commerce Act, Part IV, 49 U.S.C. §§ 1001–1022. It is equally undisputed that the Federal Maritime Commission has jurisdiction to regulate non-vessel-operating common carriers by water (NVO's). See Shipping Act of 1916, 46 U.S.C. §§ 801–842; Intercoastal Shipping Act of 1933, 46 U.S.C. §§ 843–848. Hawaiian Express argues that Pacific's activities, while admittedly those of an NVO, also bring Pacific within the definition of a freight forwarder, and, hence, in light of the conflict-of-jurisdiction provision of Section 33 of the Shipping Act of 1916, 46 U.S.C. § 832,[1] Pacific's business falls within the I.C.C.'s jurisdiction. The purpose of Section 33 is to obviate a conflict of jurisdiction if any substantive provision of the Shipping Act of 1916 should overlap a corresponding provision of the Interstate Commerce Act. H.R.Rep. No. 569, 64th Cong., 1st Sess. (1916).

As a result of a belief that integrated regulation of freight forwarders was in the public interest, Congress in 1942 passed, and in 1950 amended, Part IV of the Interstate Commerce Act regulating freight forwarders. Section 402(a)(5), 49 U.S.C. § 1002(a)(5) defines the term "freight forwarder" as any person, other than certain carriers, who:

"* * * [H]olds itself out to the general public as a common carrier * * * in interstate commerce, and which, in the ordinary course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part

of the transportation of such shipments, the services of a carrier or carriers subject to chapters 1, 8, or 12 of this title [hereinafter referred to as 'Part II carriers']."

49 U.S.C. § 1010(a)(1) provides that it shall be illegal for any person to engage in the business of freight forwarding without first obtaining a permit from the I.C.C.

■ On the stipulated facts, Pacific's activities fall within subdivisions (A) and (B) of the definition of a freight forwarder. The crucial question is whether Pacific's activities also fall within subdivision (C), i. e., whether Pacific sufficiently "utilizes" the services of a Part II motor carrier. The district court, relying primarily upon IML SeaTransit v. United States, 343 F.Supp. 32 (N.D.Cal.) aff'd, 409 U.S. 1002, 93 S.Ct. 433, 34 L.Ed.2d 295 (1972), concluded that Pacific had not "utilized" a motor carrier within the meaning of Section 402(a)(5).

Contacts between Pacific and motor carriers occur at three stages of the shipment process: first, carriage from the point of origin to Pacific's terminal; second, carriage from the terminal to the piers of the vessel-operating water carrier; and third, carriage from the piers and terminals in Hawaii to the ultimate destination.

The third contact can be dismissed quickly by noting that local Hawaiian motor carriers are exempt from the Interstate Commerce Act. Ex Parte MC–59, Motor Carrier Operations in the State of Hawaii, *supra*. Consequently, such carriers are not subject to Part II of the Act, and utilization of such a carrier could not of itself bring Pacific within subdivision (C) of the freight-forwarder definition.

At the second stage of contact with motor carriers, there is a difference between Pacific's arrangements with Mat-

---

1. "This chapter shall not be construed to affect the power or jurisdiction of the Interstate Commerce Commission, nor to confer upon the Federal Maritime Board concurrent power or jurisdiction over any matter within the power or jurisdiction of such Interstate Commerce Commission * * *."

son and its arrangements with Seatrain. When Matson is the ocean carrier, Pacific's contact must be described as a mere incident to the performance of services pursuant to Matson's all-water tariff filed with the Maritime Commission, and, under the *IML Sea Transit* case, does not amount to a sufficiently "substantial" commercial connection between Pacific and the Matson-designated motor carrier to support a finding of "utilization" by Pacific. IML Sea-Transit v. United States, 343 F.Supp. at 42. However, when Seatrain is the ocean carrier, the charges are assessed pursuant to a joint tariff filed with the I.C.C. The court in *IML Sea Transit* refrained from deciding whether Sea-Transit would have "utilized" a Part II motor carrier had Matson and the motor carrier Matson employed entered into through-route and joint-rate agreements pursuant to an appropriate I.C.C. tariff. We need not grapple with that question, for in this case there is another basis for holding that Pacific "utilizes" a Part II motor carrier.

The parties stipulated that at least part of the time Pacific arranges for the transportation of freight by motor carrier from a point of origin to the Pacific terminal. In such a situation, Pacific, not Matson or Seatrain, called a motor carrier, arranged for the pickup, and, in some cases, invoiced the through charges from the initial origin to the Hawaiian destination. This activity amounts to a sufficiently substantial commercial connection with a motor carrier to be included within the reach of Section 402(a)(5). It was precisely this relationship between long-distance transportation by water or rail and local motor-carrier collection or distribution

with which Congress was concerned when it amended Sections 402 and 409 of the Interstate Commerce Act in 1950. 1950 U.S.Code Cong.Serv., pp. 4216–4220. The purpose of the amendments was to authorize the I.C.C. to prescribe terms and conditions allowing local Part II motor carriers to charge freight forwarders less for consolidation and distribution pickup service than the motor carriers charged the shipping public generally for such local shipments, and thus enable freight forwarders to secure the profit margin necessary to support their assembly and break-bulk services.[2] Congress explicitly recognized that, as a result of using motor carriers to gather and distribute shipments in wide areas around their consolidation and distribution stations, freight forwarders were able to expand their services beyond terminal-to-terminal movements between large cities to provide a coordinated nation-wide service. It is only by calling on motor common carriers to pick up the freight from the shipper and deliver it to Pacific's terminal for consolidation and assembly that Pacific is able to provide its advertised through, door-to-door service.

In light of the statutory purpose, we conclude that Pacific utilizes a motor carrier within the meaning of 49 U.S.C. § 1002(a)(5), and that it is therefore a freight forwarder subject to I.C.C. regulation. Inasmuch as Pacific does not have an I.C.C. permit authorizing it to engage in freight forwarding between the San Francisco Bay Area and Hawaii, the requested injunction should have been granted. 49 U.S.C. § 1017(b)(2).

Reversed and remanded, with instructions to enter an appropriate order.

2. The Supreme Court's holding in Acme Fast Freight, Inc. v. United States, 309 U.S. 638, 60 S.Ct. 810, 84 L.Ed. 993, aff'g 30 F.Supp. 968 (S.D.N.Y.1940), that the Motor Carrier Act did not authorize joint rates between freight forwarders and motor carriers, thus requiring motor carriers to charge freight forwarders the same rates charged the shipping public generally, made it imperative that Congress act to provide for the continuance of the freight forwarder's coordinated service to the public. 1950 U.S.Code Cong. Serv., pp. 4218–4219.