AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents.

INTERNATIONAL BUSINESS MACHINES CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents.

SECURITIES INDUSTRY AUTOMATION CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents.

UNITED SYSTEM SERVICE, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents.

TELENET COMMUNICATIONS CORP., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents.

AERONAUTICAL RADIO, INC. and Air Transport Association of America, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,

MCI Telecommunications Corp., et al., Utilities Telecommunications Council, Computer & Business Equipment Manufacturers Assn., Aeronautical Radio, Inc. and Air Transport Assn. of America, American Telephone & Telegraph Co., Securities Industry Automation Corp., American Trucking Assn., Inc., Telenet Communications Corp., Western Union International Inc., RCA Global Communications Inc., United System Service, Inc., Remote Processing Services Section (RPSS) of the Ass'n of Data Processing, Service Organizations, Inc., Southern Pacific Communications Co., ITT World Communications, Inc., American Petroleum Institute, American Newspaper Publishers Assoc., et al., International Business Machines Corp., MCI Telecommunications Corporation and Microwave Communication, Inc., Graphic Systems, Inc., Graphic Scanning Corp., Intervenors.

Nos. 1349 to 1354  Dockets 77–4057, 77–4067, 77–4068 and 77–4073 to 77–4075.

United States Court of Appeals, Second Circuit.

Argued July 18, 1977.
Decided Jan. 26, 1978.

Charles Lister, Washington, D. C. (Paul J. Berman, Washington, D. C., Alfred A. Green, J. Robert Fitzgerald, F. Mark Garlinghouse, New York City, Edgar Mayfield, Bedminster, N. J., of counsel), for petitioner A. T & T. Co.

J. Roger Wollenberg, Washington, D. C. (David R. Anderson, William T. Lake, Roger M. Witten, Erica A. Ward, Wilmer, Cutler & Pickering, Washington, D. C., Thomas D. Barr, Robert F. Mullen, Ronald S. Rolfe, Cravath, Swaine & Moore, New York City, J. Gordon Walter, IBM, Armonk, N. Y., of counsel), for petitioner-intervenor, IBM Corp.

Warren E. Baker, Kansas City, Mo. (Lawrence Kill, Anderson, Russell Kill & Olick, New York City, John M. Lothschuetz, Carolyn C. Hill, Washington, D. C., of counsel), for petitioner United System Service, Inc.

Donald E. Ward, Washington, D. C. (Philip M. Walker, Gen. Counsel, Telenet Communications Corp., Washington, D. C., of counsel), for petitioner Telenet Communications Corp.

Charles R. Cutler, Washington, D. C. (John L. Bartlett, Kirkland, Ellis & Rowe, Washington, D. C., James E. Landry, Gen. Counsel, Air Transport Ass'n of America, Washington, D. C., of counsel), for petitioners-intervenors Aeronautical Radio, Inc. and Air Transport Ass'n of America.

John E. Ingle, Counsel, F. C. C., Washington, D. C. (Werner K. Hartenberger, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D. C., John H. Shenefield, Acting Asst. Atty. Gen., Robert B. Nicholson, Joen Grant, Dept. of Justice, Washington, D. C., of counsel), for respondents.

William J. Byrnes, Washington, D. C. (Michael H. Bader, Kenneth A. Cox, Raymond C. Fay, Haley, Bader & Potts, Washington, D. C., John R. Worthington, MCI Telecommunications Corp., Washington, D. C., of counsel), for intervenors MCI Telecommunications Corp. and Microwave Communications, Inc.

Philips B. Patton, Washington, D. C. (Jeremiah Courtney, Arthur Blooston, Washington, D. C., of counsel), for intervenor American Trucking Associations, Inc.

Howard G. Kristol, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City (Thormund A. Miller, Richard S. Kopf, James M. Tobin, San Francisco, Cal., Herbert E. Forrest, Steptoe & Johnson, Washington, D. C., of counsel), for intervenor Southern Pacific Communications Co.

Mahlon M. Frankhauser, Michael Yourshaw, Thomas W. Queen, Kirkland, Ellis & Rowe, Washington, D. C., for intervenor Securities Industry Automation Corp.

Joseph M. Kittner, Edward P. Taptich, Norman P. Leventhal, McKenna, Wilkinson & Kittner, Washington, D. C., John S. Voorhees, Howrey, Simon, Baker & Murchison, Washington, D. C., for intervenor Computer and Business Equipment Manufacturers Ass'n.

Joseph E. Keller, Wayne V. Black, Larry S. Solomon, Christine A. Meagher, Keller & Heckman, Washington, D. C., for intervenor American Petroleum Institute.

Charles M. Meehan, Keller & Heckman, Washington, D. C., for intervenor Utilities Telecommunications Council.

Before MESKILL, Circuit Judge, and STEWART * and WARD,** District Judges.

MESKILL, Circuit Judge:

The type of interstate telephone service most people are familiar with—the type used in most homes and offices—is public telecommunications service. This includes

---

* Hon. Charles E. Stewart, Jr., of the United States District Court for the Southern District of New York, sitting by designation.

** Hon. Robert J. Ward, of the United States District Court for the Southern District of New York, sitting by designation.

normal long distance service.[1] Charges for this type of service are generally based on use, i. e., a "toll" is charged for each call.

In contrast, the type of telephone service involved in this case is private line service.[2] Telephone companies make this special type of service available in bulk, at rates below those for normal long distance service, to customers such as businesses and government with substantial communications needs. A subscriber to private line service typically buys the right to use telephone facilities between two or more pre-selected locations on a full-time basis. The facilities involved are generally capable of instant connection between locations. Charges for the service are made on a flat, periodic rate basis and depend, generally, on the number of connected locations and the distance between them. Private line services are used for normal voice communications, radio and television signal transmission, teletypewriter and remote meter monitoring, and specialized service for high-speed data and facsimile communications.

As is true of bulk offerings in other areas of commerce, private line services, as sold by the major carriers, are often underutilized. For example, a telephone company customer may need to communicate between two locations quickly and at any time during the day or night. It may be economical for such a customer to buy private line services at bulk rates, rather than normal long distance rates, but it would probably not be necessary to communicate between the two locations constantly. When the customer is not using the facilities, they go to waste. This underutilization makes the bulk offerings attractive to small customers, who would be willing to aggregate their needs and "share"[3] both the services and the discount, and to middlemen, who would buy the services at the discount rate and "resell"[4] them to customers at rates below the normal long distance rates.

The desire of some businesses to share or resell private line services has been frustrated by a communications industry tradition under which carriers that own and operate transmission facilities supply service to ultimate users directly, without middlemen. This tradition is embodied in carrier-initiated tariffs that forbid, in both public telecommunications service and private line service, a customer to share or resell a purchased service. There are, of course, exceptions. For example, local exchange and long distance service may not be resold (this is why a hotel may not impose a surcharge on interstate calls, see *Ambassador, Inc. v. United States*, 325 U.S. 317, 65 S.Ct. 1151, 89 L.Ed. 1637 (1945)), but they may be shared, so long as the subscriber does not profit from the sharing. There are also exceptions with regard to private line service. Western Union resells service obtained from American Telephone & Telegraph ("AT&T"); so do certain specialized common carriers. Some special groups, including airlines, electric utilities and the securities industry, enjoy the right to share service provided through an authorized intermediary under the so-called "single customer" tariff exception. News services enjoy a similar right under the so-called "joint use"

---

1. This is also referred to as "message telecommunications service" or "message toll service," both of which are abbreviated "MTS". Public telecommunications service also includes Wide Area Telecommunications Service ("WATS"), to which a customer can subscribe, on a full-time or measured-time basis, in order to obtain service over a wide geographical area, with charges generally based on a flat periodic rate. Both MTS and WATS are distinguishable from "telephone exchange service," 47 U.S.C. § 153(r), commonly referred to as "local" or "basic" "exchange service".

2. This is also referred to as "leased line service".

3. "Sharing," also referred to as "joint use" or "third-party use," is defined by the FCC as "a non-profit arrangement in which several users collectively use communications services and facilities provided by a carrier, with each user paying . . . according to its pro rata usage. . . ." 60 F.C.C.2d at 263.

4. "Resale" is defined by the FCC as "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public (with or without 'adding value') for profit." 60 F.C.C.2d at 271.

tariff exception. A small number of organizations known as "value added" carriers are authorized to resell private line services which they augment by adding data or facsimile communications services.

Some of the businesses that would like to engage in resale or sharing of private line services, but which were barred from doing so under existing tariff restrictions, challenged those restrictions as unjust and unreasonable—a refusal to provide services "upon reasonable request therefor" in violation of § 201(a) of the Communications Act of 1934 ("the Communications Act"), 47 U.S.C. § 201(a). The tariff exceptions were challenged as discriminatory, a violation of § 202(a) of the Communications Act.

The order now under review resulted from a proceeding initiated by the Federal Communications Commission ("FCC") by a Notice of Inquiry and Proposed Rulemaking. 47 F.C.C.2d 644 (1974) ("Notice"). The Notice called for three rounds of comments on the subject of sharing and resale restrictions. Over forty organizations participated by filing comments. In July of 1976, the FCC released its Report. *In re Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities*, 60 F.C.C.2d 261 (1976), *amended on reconsideration*, 62 F.C.C.2d 588 (1977) ("Report"). The FCC concluded that existing tariffs were unjust, unreasonable and discriminatory, and it prescribed unlimited resale and sharing. The FCC found that resale is common carrier activity within the meaning of 47 U.S.C. § 153(h) and decided to regulate it as such. The FCC also found that sharing was not common carriage and decided that it would not

be regulated but, instead, would be monitored in order to ensure that activity which purported to be sharing was not or would not become a device for masking a resale.

The consolidated petitions for review now before this Court challenge the FCC Report on several grounds. First, it is argued that the FCC's "notice and comment" procedures denied AT&T an adequate hearing. Second, it is argued that the FCC's decisions regarding the fairness and reasonableness of unlimited resale and sharing were not supported by the record. Third, it is argued that resellers are not common carriers and should not be regulated. Fourth, it is argued that the FCC did not go far enough and should have regulated sharers in addition to resellers. We reject these contentions and affirm the FCC's decision in all respects.

## THE FCC's HEARING PROCEDURES.

The prescription of unlimited resale and sharing of private line services was an exercise of the FCC's authority under § 205(a) of the Communications Act to prescribe practices.[5] AT&T argues that it was entitled to a trial-type evidentiary hearing prior to such a prescription and that, therefore, the FCC's "notice and comment" procedures were inadequate. In order to show that the procedures were inadequate, AT&T must demonstrate that they failed to meet the requirements of either the Administrative Procedure Act ("APA") or the Communications Act.

The APA requires trial-type hearings only "[w]hen rules [or adjudications]

---

5. 47 U.S.C. § 205(a) provides:

Whenever, after full opportunity for hearing, upon a complaint or under an order for investigation and hearing made by the Commission on its own initiative, the Commission shall be of opinion that any charge, classification, regulation, or practice of any carrier or carriers is or will be in violation of any of the provisions of this chapter, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable charge or the maximum or minimum, or maximum and minimum, charge or charges to be thereafter observed, and what

classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation *to the extent that the Commission finds that the same does or will exist*, and shall not thereafter publish, demand, or collect any charge other than the charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed.

are required by statute to be made [or determined] *on the record* after opportunity for an agency hearing." 5 U.S.C. §§ 553(c), 554(a) (emphasis added). Since *United States v. Florida East Coast Ry.*, 410 U.S. 224, 236–38, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), the words "on the record" have become, as the District of Columbia Circuit has observed, a "touchstone test" for the applicability of the APA's trial-type procedures. *Mobil Oil Corp. v. F. P. C.*, 157 U.S.App.D.C. 235, 247, 483 F.2d 1238, 1250 (1973). The Communications Act does not require that rules be made "on the record" but merely that they be made "after full opportunity for hearing." 47 U.S.C. § 205(a). Therefore, the APA does not require trial-type procedures here. AT&T argues, however, that the phrase "after full opportunity for hearing" requires trial-type hearings independent of the APA. Because the APA is not the exclusive source of provisions relating to the procedural requirements for administrative hearings, 5 U.S.C. § 559, we must consider whether § 205(a) of the Communications Act established hearing requirements that were unaffected by the subsequent enactment of the APA.

The decided cases supply considerable guidance. In *Florida East Coast*, the Supreme Court held that the phrase "after hearing" in the Interstate Commerce Act, 49 U.S.C. § 1(14)(a), created no right to a trial-type hearing independent of the APA. 410 U.S. at 238–42, 93 S.Ct. 810. Similarly, in *Bell Telephone Co. of Pennsylvania v. F. C. C.*, 503 F.2d 1250, 1264–68 (3d Cir. 1974), *cert. denied*, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975), the Third Circuit held that "notice and comment" procedures were adequate to satisfy the "opportunity for hearing" requirement in § 201(a) of the Communications Act, and in *RCA Global Communications, Inc. v. F. C. C.*, 559 F.2d 881 (2d Cir. 1977), we held that the "full hearing" requirement found in § 222(e)(3) of the Communications Act could be satisfied by "notice and comment" procedures. We thus have important precedent regarding the phrases "after hearing," "opportunity for hearing" and "full hearing."

The phrase "after full opportunity for hearing" found in § 205(a) of the Communications Act is something of an amalgam of these phrases. The nature of the hearing required, however, is hardly a function of the length of the phrase used to describe it. In fact, the language of § 205(a) presents a weaker case for a trial-type hearing than did *RCA Global's* "full hearing" language. The word "full" in § 205(a) modifies the word "opportunity" rather than the word "hearing." Certainly AT&T had a "full *opportunity* for hearing." It participated in all three rounds of comments, and after the FCC's initial Report it filed both a petition for reconsideration and replies to comments made by other parties regarding the various petitions for reconsideration. AT&T may not complain that it had anything less than a "full opportunity" to be heard.

Beyond this, the primary focus of our inquiry is not so much on the language of the statute as "on the requirements of the particular case." *RCA Global, supra*, 559 F.2d at 886. Under *Florida East Coast*, we are required to distinguish between "proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." 410 U.S. at 245, 93 S.Ct. at 821. *See generally* Friendly, *"Some Kind of Hearing,"* 123 U.Pa.L.Rev. 1267, 1305–15 (1975). It is incontrovertible that both the purpose and effect of the challenged proceedings was to establish FCC policy with respect to the resale and sharing of private line services. Therefore, it is apparent that the FCC was acting in a rule-making rather than an adjudicatory capacity. However, in an effort to demonstrate that the FCC's inquiry was really "designed to adjudicate disputed facts," AT&T argues that there was a dispute concerning the economic impact of the removal of resale and sharing restrictions on both the carriers and the public. This argument lacks merit because the existence of such an issue does not require a trial-type hearing. As Judge Leventhal explained in an analogous context:

The issue involves what Professor Davis calls "legislative" rather than "adjudicative" facts. It is the kind of issue involving expert opinions and forecasts, which cannot be decisively resolved by testimony. It is the kind of issue where a month of experience will be worth a year of hearings.

*American Airlines, Inc. v. C. A. B.*, 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633 (en banc), *cert. denied*, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966) (footnote omitted). A trial-type hearing was not required to consider the economic impact of the Commission's decision. Accordingly, we hold that the hearing requirement of § 205(a) of the Communications Act was satisfied by the "notice and comment" procedures followed here.

## RECORD SUPPORT FOR THE FCC'S CONCLUSIONS.

As near as we can determine, AT&T does not challenge the FCC's determination regarding the illegality of existing tariffs. What AT&T does challenge is the alleged lack of record support for the FCC's finding that its chosen remedy, the prescription of unlimited resale and sharing, will be "just, fair, and reasonable."

Before the FCC can prescribe a practice under § 205(a) of the Communications Act, it must make a finding that the practice will be "just, fair, and reasonable." *A. T. & T. Co. v. F. C. C.*, 449 F.2d 439, 450–51 (2d Cir. 1971). This finding must be supported by substantial evidence and based on a "reasoned consideration" of that evidence. *See Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *Greater Boston Television Corp. v. F. C. C.*, 143 U.S.App.D.C. 383, 392, 444 F.2d 841, 850–52 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

The FCC did, in fact, find that unlimited resale and sharing would be just, fair, and reasonable. AT&T's characterization of this finding as a "conclusory announcement" is unfounded. The FCC went to great lengths to explain the basis for its finding. It explained that its prescription would result in increased competition and would provide economic incentives that either singly or together could reasonably be expected to (1) encourage cost-related pricing, (2) promote just, reasonable charges and discourage discrimination, thereby reducing the need for FCC oversight, (3) lead to more efficient utilization of communications facilities that now go to waste, (4) result in better management and marketing, (5) generate increased research and development, (6) produce an increased variety of communications services and (7) effect growth of the total market for specialized telecommunications services. We agree with the FCC that each of these expectations is reasonable. More than that, they are rationally based both on well established economic principles and on the actual experience of the numerous organizations that have operated pursuant to existing tariffs, experience reflected in the comments submitted to the FCC by many of those organizations. Although it does not appear that the FCC had before it any comments by a pure "resale broker" of the kind that will be permitted to operate if resale and sharing restrictions are lifted, its determination that benefit will result was based on the experience of similar, existing resellers and sharers, as well as on the experience of entities performing brokerage functions in a comparable industry. For example, the FCC considered the operations of freight forwarders in the railroad industry, who purchase freight space from railroads at bulk carload rates and sell to customers with less-than-carload lots at rates between those for bulk carload lots and less-than-carload lots.

■ AT&T's major quarrel with the record is based on the alleged lack of an economic analysis of the impact of the FCC's decision. AT&T submitted a study that predicted revenue losses and cost increases. This study was rejected by the FCC for reasons not seriously challenged by AT&T. What AT&T appears to argue is that the FCC was required to accept its claims of financial harm absent a study showing the contrary. We do not agree. All that is required is that the FCC's finding be sup-

ported by reasoned consideration and substantial evidence. *See Permian Basin, supra,* 390 U.S. at 792, 88 S.Ct. 1344; *Greater Boston Television Corp., supra,* 444 F.2d at 850–52. Upon review of the economic factors and evidence considered by the FCC, we are satisfied that these requirements were met.

■ We agree with the decision of the Court in *North Carolina Utilities Commission v. F. C. C.,* 552 F.2d 1036 (4th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977), that in cases such as the one now before us, where carrier-initiated tariffs are found to be illegal, the FCC need not "conduct exhaustive economic impact studies before taking action." *Id.,* at 1054; *see Mobil Oil Corp. v. F. P. C.,* 417 U.S. 283, 318–19, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974). The FCC may institute broad policy changes while leaving for future proceedings the fine tuning of the rate structure required to adjust for the economic impact of those changes. As the Court explained in *American Airlines, Inc. v. C. A. B., supra,* 123 U.S.App.D.C. 319, 359 F.2d 633: "It is part of the genius of the administrative process that its flexibility permits adoption of approaches subject to expeditious adjustment in the light of experience."

## REGULATION OF RESELLERS AND SHARERS.

■ The FCC held that the resale of communications service is common carrier activity within the meaning of § 3(h) of the Communications Act, 47 U.S.C. § 153(h), and that those engaged in such resale are subject to the regulatory provisions of Title II of the Act, which deals with communication common carriers, 47 U.S.C. §§ 201–223. The term "common carrier" is defined in § 3(h) as "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy. . . ." The FCC's regulations, 47 C.F.R. § 21.2, is unenlightening. It defines a "communication common carrier" as "[a]ny person engaged in rendering communication service for hire to the public." At

least since *Mackay Radio and Telegraph Co.,* 6 F.C.C. 562 (1938), the FCC has held that the Communications Act covers all those who offer communications service for hire, including those who merely lease facilities from existing carriers. The FCC has also embraced the teaching of *National Association of Regulatory Utility Commissioners v. F. C. C.,* 173 U.S.App.D.C. 413, 525 F.2d 630, *cert. denied,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976), in which the District of Columbia Circuit carefully considered the definition of "common carrier" found in § 3(h) and concluded that "[w]hat appears to be essential to the quasi-public character implicit in the common carrier concept is that the carrier 'undertakes to carry for all people indifferently. . . .'" *Id.* 173 U.S.App.D.C. at 424, 525 F.2d at 641 (footnote omitted). Thus, under the FCC's interpretation, which is entitled to deference, *see Red Lion Broadcasting Co. v. F. C. C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), a common carrier is one which undertakes indifferently to provide communications service to the public for hire, regardless of the actual ownership or operation of the facilities involved.

Petitioner International Business Machines Corporation ("IBM") does not challenge this definition or its application to resellers—so far as it goes. What it does challenge is the failure of the FCC definition to account for the provision in § 153(h) that a common carrier is one "engaged . . in interstate or foreign communication by wire or radio or in interstate or foreign radio *transmission* of energy. . . ." (emphasis added). IBM points out that the definitions of "communication by wire" and "communication by radio" found in 47 U.S.C. §§ 153(a) and 153(b) specify that the communication involved consists of "the *transmission* of writing, signs, signals, pictures, and sounds of all kinds . . . ." It argues that, because resellers are basically brokers, which neither own nor operate the facilities for transmission, it cannot be said that they transmit; consequently, they are not common carriers within the meaning of the statute. IBM adopts the FCC's analogy of the status of resellers to that of

freight forwarders under the Interstate Commerce Act. Part I of that Act, which deals with railroads, defines "common carrier" as one "engaged in . . . *transportation* . . . as common carriers for hire." 49 U.S.C. § 1(3)(a) (emphasis added). Part II of the Act, which deals with motor carriers, defines a "common carrier" as one which "holds itself out to the general public to engage in the *transportation* by motor vehicle in interstate or foreign commerce of passengers or property . . . for compensation." 49 U.S.C. § 303(a)(14) (emphasis added). The Interstate Commerce Commission ("ICC") refused to regulate freight forwarders because, as mere brokers, they were not engaged in actual transportation. *See Acme Fast Freight v. United States*, 30 F.Supp. 968 (S.D.N.Y.) (3-judge court; per A. Hand, J.), *aff'd per curiam*, 309 U.S. 638, 60 S.Ct. 810, 84 L.Ed. 993 (1940).

We find IBM's argument unpersuasive. Part I of the Interstate Commerce Act defines "transportation" to "include . . . all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported." 49 U.S.C. § 1(3)(a). Under the doctrine of *expressio unius est exclusio alterius*, the failure to include the "forwarding" function in this enumeration could lead to the conclusion that "transportation" does not include that function. Part II of the Interstate Commerce Act was more explicit. It included only the motor vehicle operations of freight forwarders in the definition of "common carrier." Those who acted as forwarders simpliciter were implicitly excluded. *See Acme Fast Freight, supra*, 30 F.Supp. at 972–73, *quoting* 49 Stat. 544 (1935). The authors of the Communications Act, on the other hand, expressly included forwarding. A reading of the statutes relied on by IBM reveals that "communication by wire" and "communication by radio" include not only "transmission," but also "all instrumentalities, facilities, apparatus, and services (among other things, the receipt, *forwarding*, and delivery of communications) incidental to such transmission." 47 U.S.C. §§ 153(a) & (b) (emphasis added).

Thus, IBM's argument proves too much. If resale is viewed as akin to freight forwarding for the purpose of IBM's Interstate Commerce Act analogy, then it must also be found to be expressly included in the definitions of "communication by radio" and "communication by wire" and, concomitantly, in the definition of "common carrier." Accordingly, we find no persuasive reason to depart from the FCC's long-standing interpretation of its own organic statute as expressed in *Mackay Radio, supra*, and *National Association of Regulatory Utility Commissioners, supra*.

█ IBM's next argument is that even if resellers are common carriers, the FCC nevertheless erred in deciding that it lacked the discretion to refrain from regulation. IBM seeks a remand so that the FCC might exercise that discretion. This argument is grounded upon the notion that the FCC was unaware of the scope of its discretion. In our view the FCC was fully aware of the extent of both its responsibilities and its discretion, and a remand is inappropriate.

. The FCC has a duty to "execute and enforce the provisions of" the Communications Act, 47 U.S.C. § 151. The Communications Act requires that common carriers furnish service on reasonable request, 47 U.S.C. § 201(a); that rates and practices be just, fair, reasonable and nondiscriminatory, 47 U.S.C. §§ 201(b), 202(a); that carriers file their tariffs with the FCC, 47 U.S.C. § 203(a); that the FCC investigate complaints, 47 U.S.C. § 208; that carriers obtain certificates of public convenience and necessity before constructing, acquiring or operating any facilities or terminating any services, 47 U.S.C. § 214; that the FCC examine transactions that might affect rates or services, 47 U.S.C. § 215; and that carriers submit applications for proposed consolidations and mergers to the FCC, 47 U.S.C. § 222. We are aware of no authority for the proposition that the FCC may abdicate its responsibility to perform these duties and ensure that these statutory standards are met. In *F. P. C. v. Texaco Inc.*, 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974), the Supreme Court considered a de-

cision by the Federal Power Commission to relax the regulation of small natural gas producers. Despite the "just and reasonable" standard of the Natural Gas Act, 52 Stat. 821 §§ 4 & 5, 15 U.S.C. §§ 717c & 717d, the FPC left the rates of small producers to be controlled by the market price. The Court said the FPC lacked the authority to rely exclusively on market prices, and explained that:

> The Commission may have great discretion as to *how* to insure just and reasonable rates, but it is plain enough to us that the Act does not empower it to exempt small-producer rates from compliance with that standard.

417 U.S. at 394, 94 S.Ct. at 2325 (emphasis added).

This distinction between an agency's lack of discretion to choose whether to regulate and its broad discretion in choosing *how* to regulate was clear to the FCC in the instant case. The FCC specifically endorsed the view expressed by one of the parties that "the Act '. . . imposes certain obligations upon all carriers, and upon the Commission, which cannot be shirked. . . .' " 60 F.C.C.2d at 314. The FCC's understanding of the applicable legal standards is reflected further in its reliance on *F. P. C. v. Texaco Inc.* In addition, the FCC's analytical approach reflects a correct understanding of the law. The Report is broken down into discrete sections, one of which is entitled "Jurisdiction" and is devoted to the question whether resale and sharing constitutes common carrier activity. In the very next section, entitled "Regulation of Resale and Sharing," the FCC states:

> Having determined that the resale of communications service is a common carrier activity within the meaning of the Communications Act, we turn now to the question of *how* the Commission should regulate entities engaging in resale.

60 F.C.C.2d at 308 (emphasis added).

Because we conclude that the FCC correctly perceived the line separating its duties from its discretion, and because there is no suggestion that its discretion was abused, we find no reason to remand.

Petitioners Telenet Communications Corporation and United System Service, Inc., argue, in marked contrast to IBM, that the FCC, rather than casting its regulatory net too far, did not cast it far enough. As resellers, they perceive a competitive threat from unregulated sharers and argue that sharing should have been regulated by the FCC.

■ The FCC found that sharing is not common carriage and, therefore, not subject to regulation under Title II of the Communications Act. 47 U.S.C. § 153(h). Certainly, the FCC is not at liberty to manipulate the definition of "common carrier" in such a way as to achieve pre-determined regulatory goals. *National Association of Regulatory Utility Commissioners v. F. C. C., supra,* 173 U.S.App.D.C. at 427, 525 F.2d at 644. However, in concluding that sharing is not common carriage, the FCC did not engage in such manipulation. By definition, "[s]haring is a non-profit arrangement in which several users collectively use communication services and facilities provided by a carrier, with each user paying the communications related costs associated therewith according to its pro rata usage . . . ." 60 F.C.C.2d at 263. According to the FCC, "[a] *bona fide* sharing arrangement exists wherein each participant has a communications need (other than a need to resell the service to others) for the services and facilities being shared." 60 F.C.C.2d at 316 (emphasis added). As so defined, we can see no error in the FCC's conclusion that such activity tends to be private and is unlikely to constitute an undertaking to serve the public indiscriminately for hire. The FCC explained that it plans to regulate nominal sharing operations that begin to take on the characteristics of common carriage. Thus, a sharing operation that ceases to be a non-profit arrangement will be regulated. Profit is a significant indicium of common carriage; it increases the likelihood that the party making the profit is also making an indiscriminate offering to the public. The FCC also said it would look to the use of advertising or of short-term joint arrangements as criteria, either of

which might signal the existence of an indiscriminate offering to the public. The suggestion by petitioners that the FCC has made profit a test of common carriage, where the statute creates no such requirement, is not well taken. The FCC has not altered the statutory requirements, it has merely articulated criteria to which it will look to determine whether the statutory requirements are met. We find the use of such criteria both advisable and proper.

## MISCELLANEOUS OTHER ISSUES.

Some of the petitioners and intervenors that operated under the prior system express concern that if this Court reverses the FCC's decision to order unlimited sharing, but affirms the FCC's finding that the prior system was illegal, they will then be left in the unpleasant position of being in a business that cannot lawfully be conducted. They ask us to declare the prior system to have been lawful—a declaration that, in effect, the old system was better than nothing. Because we uphold the FCC's order in all respects, we do not reach this issue.

Intervenor Securities Industry Automation Corporation ("SIAC") has argued that the FCC erred in failing to limit sharing to entities in the same line of business. The decision whether to impose such limitations is left to the FCC's discretion. Although it may be true, as SIAC contends, that such a limitation would be "fair and reasonable," that fact does not preclude the FCC from selecting other "fair and reasonable" alternatives. Thus, we find no abuse of discretion in rejecting the limitation suggested by SIAC.

The decision of the FCC is affirmed in all respects.